110 Cal.Rptr.2d 1 (2001)
90 Cal.App.4th 1026
In re SANTOS Y., a Person Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Arturo G. et al., Defendants and Appellants;
Grand Portage Band of Chippewa Indians, Interveners and Respondents.
No. B144822.
Court of Appeal, Second District, Division Two.
July 20, 2001.
Rehearing Granted August 15, 2001.
*7 Ernesto P. Rey and John L. Dodd, Tustin, for Defendants and Appellants.
No appearance for Respondent.
Vito A. Constanzo, Holland and Knight, San Francisco, for Interveners and Respondents, on behalf of the Grand Portage Band of Chippewa Indians.
Christie Parker & Hale, Irvine, Brian Brookey; Native American Rights Fund and Mark C. Tilden as Amici Curiae on behalf of Interveners.
Janette Freeman Cochran, Pasadena, for Minor under appointment of the Court of Appeal.
BOREN, P.J.

INTRODUCTION
The trial court, feeling compelled by the Indian Child Welfare Act, ordered the Minor in this dependency case removed from the home of the only parents the Minor knows and transferred to a home on a Chippewa Indian reservation in Minnesota. We apply the "existing Indian family doctrine" and the doctrine of waiver to reverse the trial court's placement order.

*8 SUMMARY
In a hearing under Welfare and Institutions Code section 366.26,[1] the trial court terminated parental rights and, under authority of the Indian Child Welfare Act (the ICWA or the Act) (25 U.S.C. ง 1901 et seq.), ordered Santos Y. (hereafter the Minor) removed from his foster adoptive home with his de facto parents, Arturo G. and Lucila G. (also known as Lucila C.) (hereafter Appellants), and placed in a pre-adoptive home on the Grand Portage Reservation of the Minnesota Chippewa Tribe (the Tribe) in Minnesota.
The Minor is a two-and-one-half-year-old multi-ethnic boy born prematurely November 25, 1998, in Los Angeles. He has lived in foster care since birth, and with Appellants since he was three months old. Appellants presently remain his caretakers, and were granted de facto parent status. The Minor regards Appellants as his parents, and the permanent plan for the Minor, prior to the order considered here, was that Appellants would adopt him should his parents fail to reunify.
The Minor was detained by respondent Los Angeles County, through its Department of Children and Family Services (the Department), immediately after his birth, due to a toxicology screen positive for cocaine. A dependency petition was sustained on January 13, 1999, based on the toxicology screen, as well as a finding that the natural parents' home was uninhabitable, littered with trash and debris, vermin-infested, and foul smelling.
The Minor's mother is Kathleen B. (the Mother). The Minor's declared father is Noah B. (the Father, also known as Noah Y.)[2] The Mother has been separated for four years from her husband, who lives in Los Angeles. She has had an intimate relationship with Noah B. for the past three years.
Each biological parent of the Minor has some Native-American heritage, and both now reside in Oregon, where they had lived prior to coming to California, six weeks before the Minor's birth. The parents have not appealed and are not parties to this action. The Father is of Navajo descent through a grandmother, but he is not registered with the Navajo Tribe, nor does he participate in any tribal customs. The Mother is an enrolled member of the Tribe.
The court based its determination that the ICWA applied to the Minor on a June 3, 1999, letter from the Tribe to the Mother, stating: that the Mother was of one-half Chippewa descent; she was enrolled in the Grand Portage Band; her father and grandparents had been enrolled members of the Tribe; and the "Minor was eligible" under the ICWA.
The Tribe had been served notice of the case on December 17, 1998, within three weeks of the Department having filed its initial dependency petition, and the Tribe was served regularly thereafter; it made no appearance up to and including the time that reunification services to the parents were terminated on September 21, 1999. At the September 21, 1999 hearing at which the court ordered services to the *9 parents terminated, the court ordered the Department to contact the Tribe and to engage it in attempting to find an adoptive placement for the Minor. In December 1999, after the Tribe had located the Mother's first cousin, who had decided that it would be in the Minor's best interest that he be adopted by Appellants, the Tribe notified the Department that it did not intend to intervene, and that the Minor should remain where he was placed.
On March 3, 2000, contrary to these representations, the Tribe, in the name of the Grand Portage Band of the Minnesota Chippewa (the Band) petitioned in intervention,[3] and on May 30, 2000, it asserted that the ICWA required that the Minor be placed for adoption with a Tribe member on the Grand Portage Reservation in Minnesota. ICWA placement preferences (25 U.S.C. ง 1915(a); Cal. Rules of Court, rule 1439(k)) give priority to tribal and Native-American pre-adoptive and adoptive families, absent good cause not to do so.
The Tribe is a federally recognized tribe for purposes of the ICWA. It has constituent reservations, which are not recognized by the Secretary of the Interior as Indian tribes. (63 Fed.Reg. 71941-01, Dec. 30, 1998.) The Grand Portage Reservation is one of the Tribe's reservations, and is located at the extreme northeastern corner of Minnesota, near that state's juncture with Michigan and the Canadian province of Ontario. Four hundred to 500 people live on the reservation, which is governed by the Grand Portage Reservation Tribal Council. The Tribe's headquarters is at Cass Lake, Minnesota, in North Central Minnesota.
Based on its finding that the ICWA applied to the Minor, the trial court assumed that the ICWA dictated the Minor's placement. On May 31, 2000, the Chairman of the Grand Portage Reservation Tribal Council wrote to the court, advising that the Band had located a member interested in adopting the Minor. The court held a hearing on September 29, 2000 and October 2-3, 2000, more than 18 months after the Minor had been placed with Appellants, during which it received expert and lay testimony concerning the existence of good cause to deviate from ICWA placement preferences with respect to the Minor's adoptive placement. Appellants and the Minor separately opposed the Tribe's proposal that the Minor be removed from Appellants and placed with the member of the Tribe. Based on a finding that the Minor did not possess extraordinary physical or emotional needs, the court declined to find good cause to depart from ICWA placement preferences, ordered the Minor removed from his home with Appellants, and ordered him placed with a prospective adoptive mother on the Grand Portage Band Reservation. Appellants appealed. We issued and dissolved a stay, granted a petition for supersedeas, and appointed counsel for the Minor. Counsel for the Minor filed a respondent's brief in favor of reversing the order of the juvenile court.
We reverse the trial court's placement order, finding application of the ICWA to the Minor to be unconstitutional under the Fifth, Tenth, and Fourteen Amendments to the United States Constitution. As a separate and independent ground for reversal, we find the Tribe has waived its assertion of ICWA placement preferences.

*10 FACTUAL and PROCEDURAL BACKGROUND

1. Detention Hearing (December 2, 1998)
The Minor was born prematurely on November 25, 1998, and removed from his parents' care due to a positive toxicology screen for cocaine. The Department filed a petition December 1, 1998, alleging that the Minor came within section 300, subdivisions (b) and (c) because he had been born suffering from symptoms of cocaine withdrawal due to his Mother's use, and his Father knew or should have known of the drug use, and had failed to protect him. The Mother admitted the drug use, but maintained it was a recent and isolated occurrence. The Minor was ordered into foster care, and the parents were granted visitation three times a week.
The juvenile court immediately queried the parents concerning tribal associations. The Mother informed the court that she was enrolled in the Tribe. The Father stated that he was of Navajo descent through a grandmother. On December 17, 1998, the Department served, by certified mail, a "Notice of Involuntary Child Custody Proceedings Involving Indian Child" to the Navajo Tribe of Arizona/New Mexico at Window Rock, Arizona, and to the "Minnesota Chippewa Tribe" at Cass Lake, Minnesota. For the February 5, 1999 hearing, the Department sent a similarly addressed notice by certified mail to the tribes.

2. Jurisdictional Hearing (January 13, 1999)
An amended dependency petition was filed January 13, 1999, adding uninhabitable home allegations to the allegations in the initial petition. The home was described as unsanitary, littered with trash and debris, foul smelling, and overrun with mice and rats. The allegations of the petition, as amended, were sustained, and the court entered jurisdictional orders. A dispositional hearing was set for February 5, 1999.
According to the Department's report to the court, the Father had related that he was not registered with the Navajo tribe and did not participate in any tribal customs. The Mother informed the Department that she was a member of the Tribe, but that she had lost any documents connecting her with the Tribe when her mother had died (17 years before).

3. Dispositional Hearing (February 5,1999)
At the February 5, 1999 dispositional hearing, the juvenile court maintained foster care placement, reunification services, and allowed the parents twice-weekly monitored visits. The court set a non-appearance progress report hearing for May 17, 1999, and calendared a "Permanent Plan Hearing" for August 6,1999.
The Department reported that the Tribe had notified it by letter on February 2, 1999, that it had no record that either the Mother or the Minor was enrolled. On April 5, 1999, because "Neither the Chippewa Tribe nor the Navajo Nation could find any record of Santos' parents being registered as . . ., tribe members," the Department's ICWA Program "closed it's file on this case. . . ." Nonetheless, notice was thereafter given to both the Chippewa and Navajo Tribes concerning scheduled hearings.
The Department reported that the Minor had been placed with Appellants on March 27, 1999, and that the concurrent plan for the Minor, as of April 15, 1999, was that Appellants would adopt him if his parents were unable to reunify. On April 15, 1999, the Department first discussed adoption with appellant Lucila C, and she *11 had confirmed that she and her husband, Arturo, wanted to adopt the Minor.

4. Six-Month Review Hearing (May 17,1999)
In its report for the May 17,1999 review hearing, the Department related the parents' total noncompliance with the case plan, and their lack of progress in addressing the problems which had led to the Minor's dependency. The parents' contact with the Minor was reported to be infrequent, only three visits since he had been placed with Appellants.
The Department informed the court that it was improbable that the Minor could be returned to his parents' home by the August 6, 1999 permanent plan hearing date, and that it was likely that the Minor could be placed in permanent planning for adoption by Appellants by the August 1999 date. The Department related: "The minor appears to have a special bond with his foster family. The minor is a happy and healthy child. The minor is always smiling and appears to enjoy the foster mother's love and attention. The foster parents have fallen in love with the minor and want to adopt the minor if family reunification with the parents is not successful."
The Department's report informed the court that on February 2, 1999, the Tribe had sent a letter to the Department stating that the Minor was not enrolled in the Tribe, but that "[t]he issues of the Indian Child Welfare Act status in this case remain unknown as the Minnesota Chippewa Tribe has yet to respond to request for further information and up date as to eligibility of the minor and or family to fall under that definition."
At the May 17, 1999 six-month review hearing, the previous orders for suitable placement and reunification services were continued. The Department informed the court that although the Navajo tribe had sent a letter confirming "no heritage," the Minnesota Chippewa Tribe had not responded to the Department's request for clarification regarding the Minor's eligibility for membership. The court stated that the Tribe needed to either say yes or no, and ordered that the parents and the Tribe be given notice for the August 6, 1999 continued six-month review hearing. On July 15, 1999, notice of the August 6, 1999 hearing was sent to the Tribe. It was sent again on July 26, 1999.

5. Six-Month Review Hearing (August 6, 1999)
On August 3, 1999, the Department's children's social worker (CSW) received a copy of a letter from the Tribe, asserting that the ICWA applied to the Minor. The letter, dated June 3, 1999, was addressed to the Mother, and was mailed by her to the Department on July 27, 1999, seven weeks after it was written. The letter stated that the Mother's father and grandparents were enrolled in the Tribe, that the Mother was half-degree Chippewa, that the Minor was "eligible for ICWA," and that the Tribe would forward her letter to the Grand Portage Band, where she was enrolled. The Tribe's letter to the Mother advised her to inform the Department that it was required to send all notices regarding the Minor to the Tribe at post office box 217, Cass Lake, Minnesota 56633. The letter, signed by Adrienne Adkins, Director, the Minnesota Chippewa Tribe, Human Services Division, advised, "I will wait to hear from you and L.A. County." The signator was the same person to whom the Department had sent its initial notice, and the address of the Tribe was that employed by the Department in *12 its notices to the Tribe.[4] On August 4, 1999, the Department faxed to the Tribe a third notice of the August 6, 1999 hearing, accompanied by the court's most recent minute order.

On August 6, 1999, at the hearing at which the Department had indicated that the Minor could be placed in permanent planning for adoption by Appellants, the Mother's attorney told the court that he had a letter from the Tribe stating that the Minor was eligible for enrollment.[5] The court then continued the six-month review hearing from August 6,1999, to September 21, 1999, for a supplemental report and for a hearing contested by the Mother. Based upon the letter from the Tribe, the court found that the ICWA applied to the Minor, and ordered the Department to find a Native-American home for the Minor, if possible. The Tribe did not appear.

6. Six-Month Review Hearing (September 21, 1999)
The Department's report for the September 21, 1999 hearing informed the court that the parents remained noncompliant with court-ordered treatment, that they had not visited the Minor in the past five months, and that the Department recommended that the matter be set for a hearing under section 366.26 to terminate parental rights and to select and implement a permanent plan of adoption for the Minor. The Department's CSW reported that she had been informed by the Indian Child Welfare Services agency that no "Indian homes"[6] were available as of August 10, 1999, and that the agency promised to notify the Department if a vacancy arose.
The Department's report stated that on August 17, 1999, the CSW spoke with appellant Lucila G., informing her that the Minor was "being registered in the Chippewa Tribe" and "that the court had ordered for the Minor to be placed in a Native-American home." The CSW reported that the "foster mother wept and held Minor Santos very tight[ly] and repeatedly told the Minor how much she loved him. . . . CSW informed foster mother that there was [sic] no Native-American[] homes available at the moment so for the present time Minor Santos would remain under her care. . . . Foster mother states that if the parents fail to reunify with [the Minor, Appellants] are interested in adopting the Minor and teaching the Minor about his Indian heritage as he grows."
The Department's report included a letter dated August 17, 1999, from Lisa A. Carruthers, M.S., of "Rosemary Children's Services."[7] The letter stated that Appellants wished to adopt the Minor, that the Minor at nine months of age was "very attached" to Appellants, that Appellants had provided the Minor "a very loving and nurturing home" and would continue to provide "a warm and loving upbringing." The letter said that Appellants "are aware *13 of [the Minor's] Native-American descent, and are amenable to teaching Santos about his heritage as he grows older." The letter also related that the Minor "may have a very difficult adjustment if he is moved to another home and such a move could prove to be adverse to his emotional well-being."
The Tribe had been sent notice of the September 21, 1999 hearing, which had stated that termination of reunification services would be sought. There was still no response or appearance by the Tribe.
The juvenile court found that return of the nine-month-old Minor to the custody of his parents would create a substantial risk of detriment to him and that reasonable reunification efforts had been provided to the parents, but had been unsuccessful. The court found that no substantial probability existed that the Minor would be returned to the parents within six months, terminated reunification services, and scheduled a section 366.26 permanent plan hearing for January 18, 2000. The court directed the CSW to notify the Tribe that the Minor was not in an appropriate ICWA foster home, stating that the Tribe needed "to get involved right now . . . so that the native tribe of the child can find an adoptive home."

7. The Hearings for Permanency Planning

a. January 18, 2000 Hearing
For the January 18, 2000, section 366.26 permanent plan hearing, the Department recommended termination of parental rights and a permanent plan of adoption by Appellants. The Department advised that removal of the Minor from Appellants would be seriously detrimental to the Minor's emotional well-being because of his substantial psychological ties to Appellants, and recommended that the court find that the Minor's present placement was necessary and appropriate.
The Department's report for the hearing stated that the Minor had adjusted well in Appellants' home, and described the Minor "as a normal, happy, well functioning child at his current foster home. Minor appears to be very bonded with his foster parents. CSW has observed the foster parents and the Minor to be emotionally bonded with each other. This is evident by the way the Minor hugs the foster parents freely. The foster parents Arturo and Lucila have provided Minor Santos with a nurturing environment that has enabled Minor to develop appropriately for his age." The Department's report also explained that Appellants were anxious to adopt the Minor.
The Department described Appellants as a married couple who had been together for 24 years. The report related that Arturo G. is 50 years old and employed; Lucila G. is 43 years old, and a homemaker. According to the Department, Appellants successfully raised three children of their own to adulthood, and have grandchildren. The Department's report for the permanency plan hearing stated that Appellants "appear to be very capable parents" and that they "have provided their natural children with a loving and nurturing home environment."
The Department's report recommended that the natural parents not have future visits with the Minor because they had not visited regularly, and had not built a relationship with him. The report related that Minor had become upset and cried when the parents had visited for the first time in five months.
The Department's report advised that following the court's instruction to contact the Tribe to involve it in finding an adoptive home for the Minor, a series of telephone contacts between the Department's CSW and the tribal social worker (TSW) *14 for the Grand Portage Band had taken place. The Department reported that in a November 9, 1999 telephone conversation, the TSW had related that she had discussed the Minor's case with her supervisor who, she reported, would be setting up a meeting with Grand Portage Reservation Tribal Council members to determine what, if any, action to take with respect to the Minor. On November 11, 1999, the Grand Portage TSW informed the Department's CSW that she did not have a response from the tribal council concerning the Minor, but would notify the CSW as soon as she knew of one. A week later, on November 18, 1999, the Grand Portage TSW informed the Department's CSW that she had spoken with a Tribe TSW at Cass Lake, and that the Tribe had located a first cousin of the Mother, JoAnn B., who might be interested in the Minor. A month later, on December 12, 1999, the Department's CSW received a fax from the Grand Portage TSW which stated that JoAnn B. had decided that the Department's plan to have Appellants adopt the Minor was in his best interests, and that JoAnn B. was adverse to uprooting the Minor from a home he had known since he was three months old, with parents who wished to adopt him. The Department's report stated that the Grand Portage TSW had said that she was certain that there were no other relatives to contact regarding the Minor, and the report referred to an attached letter from the TSW, which the court was unable to locate.[8]
The Tribe did not appear at the hearing. The court found that the Tribe had received notice of the hearing, and related that: "The Tribe's information is they do not intend to intervene or transfer. They intend the child to remain exactly where he is." The Mother requested that the matter be set for further hearing, and indicated that she would raise not only issues related to her relationship with the Minor, but also related to the Tribe, such as late notice to it.
The court queried the Department's CSW regarding whether she had any information concerning the Tribe, and the CSW responded: "I spoke with the Tribe this morning, with the supervisor, JoAnne Lhotha, L-H-O-T-H-A. She instructed me that it's the Tribe's position that they're in agreement with the child to remain where placed, that the resource they thought they had, the first cousin is not a good resource, that they don't have any financial funds for this child or anything like that. So they're in agreement the child should remain where placed."
Because proper notice had not been given to the Father, a continuance of the hearing was necessary. The court ordered the Department to "obtain [an] expert letter from the Tribe" and to serve the Father, the Mother, and the Tribe with notice for the next hearing. The court continued the hearing to March 3, 2000. Notice for the March 3, 2000 hearing was sent to the Tribe.

b. March 3, 2000
On March 3, 2000, the day of the continued permanent plan hearing, the Tribe, as the Grand Portage Band Of Chippewa (the Band), filed a petition to intervene and a motion to continue the hearing for 60 days to allow its counsel to review and investigate the case. The Band's moving papers asserted that it had only "recently approved the associating of local counsel to petition to intervene in this matter," and also claimed that it had "received delayed notice of this matter [from the Tribe] and only recently received complete information regarding the Indian mother's circumstances." *15 The Band, which implied that it was the entity entitled to notice of the Minor's proceedings under the ICWA, alleged that the first notice it had of the Minor's case was the notice the Department had served on the Tribe on July 26, 1999, and the Band contended that service on Tribe had delayed its actual notice. Notice was further delayed, the Band alleged, because the Tribe had to trace enrollment records to determine which of its bands was associated with the Mother's relatives, and because the Band originally had received incomplete information regarding the Mother's circumstances and efforts at rehabilitation.
The court granted the motion to intervene, notwithstanding the fact that it was "very late," continued the matter to April 27, 2000, and ordered the Department to provide the Band with copies of the case reports.

c. April 27, 2000
On April 27, 2000, the day of the continued section 366.26 permanent plan hearing, the Mother filed a petition pursuant to section 388 to modify the court's previous orders, asking the court to return the Minor to her custody or reinstitute reunification services for six months. The mother failed to appear at the hearing, having called her attorney earlier in the day to report a medical emergency. By this date, the Mother was living in Oregon, and the Minor was one year old.
The Band's attorney told the court that the Band's position was the Mother should "get a second chance based on the changed circumstances." In response to queries by the court, the Department related "that the Tribe has not been able to locate a home for the child." The court appointed Dixie Noble, Ph.D., to examine and evaluate the Minor and Appellants concerning future placement and to talk to the attorneys for the Band. Noble, a Native-American, was appointed as an "Indian expert for an Indian child." Noble was to address: "[w]hether or not we can remove this child, after this amount of time, from his current home to a tribal member who's available for adoption; what kind of trauma; and if so, then what? Is she looking at a possible transition? Is she looking at the Tribe changing its position and approving the current foster home after they get to know them?"
The court continued the matter to June 1, 2000, for a contested hearing.

d. June 1, 2000
In its report for the continued contested section 366.26 permanent plan hearing, the Department recommended that the court order the Minor to remain a dependent of the court, and that he be referred for adoption services. It also recommended that the court find that Appellants were willing and capable of providing a stable and permanent environment for the Minor, and that "removal [of the minor from Appellants] would be seriously detrimental to the emotional well-being of [the Minor] because [he] has substantial psychological ties to [Appellants]." The Department advised that further visitation between the Mother and the Minor would not be detrimental to the Minor.
The Chairman of the Grand Portage Reservation Tribal Council sent a letter to the court, dated May 31, 2000, stating: "The Band will support continued efforts to reunify the mother with the child if the mother can present adequate evidence at the June 1, 2000, . . . section 388 hearing of a positive change of circumstance. . . . [U] However, if the mother fails to present adequate evidence of changed circumstances, then the Band would support termination [sic] of reunification services and adoptive placement in a Band member *16 home or Indian home. Further, the Band has now located a Band member interested in adopting this child. The Band member home is approved by the Band as an Indian foster home and [is] currently licensed by the Band for short-term and long-term foster care. The Band believes that if reunification services fail, that adoption by this Band member is in the child's best interest."
The Mother's section 388 petition was to be heard immediately prior to the section 366.26 hearing. The Mother, however, withdrew her section 388 petition, which the court dismissed without prejudice, and the court continued the permanent plan hearing another 60 days, to July 26, 2000. Without elaboration, the Department informed the court that it and the Band had each located "an adoptive Indian home."

e. July 26, 2000
On July 26, 2000, the section 366.26 permanent plan hearing, which had been continued from January 18, 2000, to March 3, 2000, to April 27, 2000, to June 1, 2000, was again on calendar.
The court had before it a letter from the Tribe, reporting that it had a new possible placement for the Minor. Also on calendar was Appellants' motion for de facto parent status.
In their motion for de facto parent status, Appellants described how, when initially placed with them, the Minor had been fragile and sickly, often requiring medical attention. They related that he had had long periods of crying and difficulty breathing, and had suffered from diarrhea, sleep disturbances, and persistent coughing. They described how they had taught the Minor to walk and talk and how he had become part of their family. They declared: "We consider this child to be our child and he considers us his parents. We love Santos. Our commitment to this child is total. We want to adopt Santos and finish raising him, providing him a warm, stable and permanent home."
The trial court granted Appellants' motion for de facto parent status.
The record indicated that Dixie Noble, Ph.D., had not yet commenced the interviews that she had been appointed on April 27, 2000, to conduct. In regard to the evaluation, counsel for Appellants informed the court: "[I]t is my clients' deepest wish to maintain contact with the Tribe, and they are willing to travel to Minnesota to take the child there, and they wish to participate fully. . . . They recognize the value of the culture and seek only to reinforce it."
The court continued the section 366.26 permanent plan hearing to August 31, 2000, in order to allow Noble an additional four weeks in which to conduct interviews and write her report.

f. August 31, 2000
On August 28, 2000, the Chairman of the Grand Portage Reservation Tribal Council wrote the court a letter, in which he advocated placement of the Minor with Jacki K, "an extended family member and Band member and resident of the Grand Portage Reservation," and recommended the Minor's eventual adoption by Jacki K., should the Mother's parental rights should be terminated. The chairman's letter stated that the Minor's adoption by a Band family would give him the "added benefit" of helping "develop his tribal identity." The letter enclosed an August 23, 2000 report and a home study by the TSW.
The TSW report asserted that Jacki K. was a relative of the Mother,[9] and related *17 that the TSW and the Band's "Mental Health consultant, Dr. Mary Sa," visited the Minor and Appellants in Los Angeles during August 2000.[10] The report stated that the Minor is "a normal two year old" who "appears to be well bonded to the foster parents who appear to love and nurture him. Due to their wonderful care of him, it is our belief that he will be able to use the skills of bonding to re-bond to an adoptive family and surrounding community." The report stated that "American Indian children do best when raised in relative homes" and recommended that the Minor be adopted by "Jacki Denise K[.] who is an extended relative of Santos and a Grand Portage Band member. Reunification with his mother is not possible due to her present choices as indicated by the home study from Salem, Oregon."
The home study of Jacki K. began: "I have known Jacki for the past four years. Jacki is an enrolled member of the Grand Portage Band of Lake Superior [sic] Chippewa Indians." The study portrayed the proposed adoptive mother, Jacki K., as someone who considered herself "a good person" and described Jacki K. as "a single woman of twenty eight years old" who "lives alone in this new trailer that she has placed on her leased land on the Reservation." The report related that Jacki K.'s 18-year-old brother and her father lived in Grand Portage.
The home study stated that Jacki K. works full time as the reservation's director of education, having been promoted to that position from the reservation's accounting department. It related that her office is located opposite the Community Center, which has a day care center for which the Minor would be eligible. The study stated that on May 9, 2000, the TSW called Jacki K. into her office and asked her to "think about" adopting the Minor, whom the TSW described as a toddler born positive for cocaine, who had been placed in foster care at about age three months, appeared to be doing very well, and was eligible for tribal enrollment. On May 10, 2000, the following day, Jacki K. told the TSW that she had spent the evening thinking about the Minor and talking with her mother, and had decided that she would like to adopt if things did not work out with the Minor's biological mother. On June 2, 2000, when the TSW telephoned Jacki K. to ask if she were still interested in adopting the Minor, Jacki K. told the TSW that she had received information leading her to believe she was related to the child as a third cousin to the Mother.
On August 30, 2000, the day before the scheduled continued section 366.26 permanent plan hearing, the Mother filed a second section 388 petition, seeking to modify the court's orders. Again, the Mother sought an order for return of the Minor to her custody or, in the alternative, reinstatement of the reunification services for six months. The petition alleged: "Although late, the mother has done everything requested. She has been clean and sober for some time an[d] has done everything as reflected in the attached declarations...." The attachments indicated that the Mother had completed an outpatient drug and alcohol treatment program on *18 May 26, 2000, and was regularly attended Alcoholic Anonymous and Narcotics Anonymous meetings.
The court denied the Mother's section 388 petitionโin part because the Mother continued to reside in Oregon and Oregon authorities refused to approve her home.[11]
The court continued the section 366.26 permanent plan hearing to the next day.

g. September 1, 2000
The trial court received the report of Dixie Noble, Ph.D., the psychologist the court had appointed on April 27, 2000, four months earlier. Noble's report recommended that the Minor "be placed in Kinship care with Jacki K. at the Tribal land in Grand Portage Minnesota." Noble grounded this recommendation on the following: "Jacki has been carefully evaluated by Tribal authorities and has been found to be an excellent potential adoptive mother for Santos. In her care, Santos will also have the advantage of a culturally endowed environment, a true belonging, and a concerned and loving extended family. This will far outweigh any emotional traumata [sic] he may experience while making the adjustment." Her report also claimed that "Santos is not now emotionally fragile. He would not be catastrophically damaged by such a shift in homes. No doubt he will experience some emotional discomfort over time. It most likely will not be severe and enduring, thanks to the firm foundation of bonding with the birth mother during pregnancy and 9 days post birth and the 18 months of excellent care provided by the Foster parents." (Emphasis added.)
Noble's report described the Minor as "a cute, olive skinned, dark-eyed, 21-month old Chippawa [sic] boy who was well groomed and casually dressed for play. . . . Santos appeared to understand both Spanish and English. However, Spanish is the language that he has begun to try and speak. [ถ] Santos was spirited, but not frenetic. . . . In . . . his play, Santos['] intelligence, grasp of physical situations and emotional cues from others, his common sense, all appeared to be well within normal limits if not slightly high."
Noble described Lucila G. as "a very pleasant, kind woman, not quite middle-aged woman who appeared to be in excellent physical health. She was slightly short by Caucasian standards but well within the normal limits for her background and ethnicity. . . . She was fully cooperative and gracious throughout the evaluation process. At the same time, she did not become so involved with others that she was not mindful of the children. [ถ] Although no psychological testing was done, Lucille [sic] appeared to be intelligent, thoughtful without undue tension or anxiety. . . . [ถ] It was clear that she has provided a warm and nurturing environment for Santos to thrive and grow with ease. She was not overly clinging and attentive with him but responded to his needs in a natural unhurried manner. Her mothering and nurturing skills are entirely appropriate and successful. All the children approach her without fear, yet with respect. . . . [ถ] Although her spoken English is limited, she understands very well *19 and can communicate effectively in the English that she does speak. Lucille [sic] is deeply attached to Santos and has fully invested herself in his care. Having made such a selfless personal investment, it is clear to see that she would feel his absence with emotional pain and loss. At the same time, as she has stated to the tribal social workers, if it is best for Santos to leave them, she would facilitate the transition in order to make it as easy as possible for Santos."
Noble described Arturo G. as "quieter and not as outreaching as Lucille [sic], yet he was sensitive and responsive to others. . . . [ถ] Because of his greater reserve, it was difficult to get to know Arturo in any depth. . . . He was perfectly comfortable with the children running around, trying different things, talking and excited about all visitors. Arturo appeared to be patient, steady and not easily irritated. He did not demonstrate any signs or symptoms of underlying psychopathology in his tone of voice, facial expressions, body language or demeanor. Apparently Arturo does not speak English as well as Lucille [sic], but the two do cooperate and get along nicely as a couple. It is my surmise that such a couple together enjoying the positive, respectful love of the children most likely give as much as they receive, if not more. Although Arturo would deeply prefer to have Santos remain in their home, he too, like Lucille [sic] would be willing to facilitate a transition for Santos to a new location."
Noble interviewed Jan Gullet, the Grand Portage TSW, and the tribal mental health consultant, Mary Sa. She also spoke with the Band's local attorney and interviewed the Mother. She did not interview Jacki K. But she states in her report: "Jacki has been carefully investigated by background checks and home studies. She is well known in the Tribal community for her good work with children and her fine character since her own childhood. Jacki is a distant relative of Kathleen; therefore, she is a blood relative to Santos. As an Indian person, a Tribal member, a relative of the biological mother and a well-trained, experienced child guidance provider, Jacki is a highly qualified prospective adoptive mother for Santos and is in exact keeping with the requirements of ICWA."
Noble's report showed that she spent the largest proportion of her time with Jan Gullet, Mary Sa, and the Mother. In the course of her evaluation, Noble did not meet with Appellants individually, as she had with the Mother and the Tribe's representatives, with whom she met with for one and two hours respectively. Noble wrote in passing in her evaluation that her did not know whether Appellants "have ever had an infant of their own."
In her evaluation of this case, Noble discussed the terms "bonding" and "attachment" at some length, associating "bonding" with the prenatal period, birth, and the first few days after birth. "If the [prenatal and immediate post-natal] bonding is successful," she states, "then the infant can begin to form `attachments' to others." With respect to foster care, Noble stated that "[i]f bonding has not occurred, then subsequent `attachments' would not be possible." She then concluded: "Attachments can be lost and rebuilt. Bonding cannot. It is much better for the child if as little change as possible can be provided for at least the first year of life. . . . A two-year-old still requires careful transitions and avoidance of frequent disruptions of caregivers. After the age of three or four years, the risk of emotional harm is less provided the child is well adjusted."
With regard to adoption, Noble admitted that "[a]doption is not risk-free. It has become increasingly clear that adoptees do *20 not `forget' about their birth parents." Noble claimed that "`Kinship' adoptions are more successful than non-relative adoptions . . . `open' adoptions are more successful. . . . [K] The rate of adolescent suicide has increased alarmingly. . . . The highest rate of adolescent suicide is among Native-American children . . . [and] is high on the reservations. It is high in urban families. It is highest when non-Indian families adopt Indian children." Noble concludes that "Santos is NOT BONDED TO THEM [Appellants]. Santos is bonded to his birth mother who is unable to care for him."
Because Noble's report had not been provided to the parties prior to the day of the hearing, the court continued the matter to September 28, 2000, for a contested section 366.26 hearing.

h. September 28โOctober 3, 2000
Jacki K., the prospective adoptive mother for the Minor, was called. She testified that she had never seen the Minor before September 2000, and that she had seen him twice, once for an hour, and the second time for other for an hour and a half. She related that she first had learned of the Minor's existence from the tribal council in May 2000, and she described the reservation and her life there.
Mary Sa, a "prelicensed" psychologist and a provider of mental health services for the Grand Portage Reservation, testified briefly concerning her observations of Jacki K.'s second visit with the Minor, and related that she was available to provide mental health services, such as play therapy, to the Minor and Jacki K.
Dixie Noble, Ph.D., testified that she had conducted an evaluation of the Minor and Appellants. She had observed the Minor on three occasions in order to formulate her opinions: (1) on August 2, 2000, for a half hour or 40 minutes, at the Rosemary Day Care Center, in the presence of the Mother and Lucila G., other foster children, and agency staff; (2) on August 13, 2000, for more than an hour, at Appellants' home, where the Minor, Appellants, Ms. Sa, Ms. Gullet, two or three representatives of the Department, and other foster children were present; and (3) briefly in the court waiting room on August 31, 2000. In toto, Noble had spent approximately 10 minutes alone with the Minor, in an encounter during the August 13, 2000 visit.
Noble did not interview Lucila G. or Arturo G. at any time.
Noble does not speak Spanish, and the court had directed her to avail herself of the services of a Spanish speaking social worker or someone from the interpreters' office for her interviews of Appellants. Noble, however, had no interpreter or Spanish-speaking social worker with her during the August 2, 2000, "conjoint visit at Rosemary Child Services," one of the two meetings with Lucila G., upon which Noble based her evaluation. Noble testified that Ms. Sa and a social worker were available to translate at Noble's second and final meeting with Lucila G., the August 13, 2000 visit to Appellants' home. Noble testified that she did not interview Lucila G. during either of her two meetings with her, but that she had a few causal "conversational comments" with the de facto mother. Arturo G. was present during Noble's August 13, 2000 visit at Appellants' home. This was Noble's only meeting with the de facto father, and Noble did not speak with him.
Noble testified that because she did not observe the Minor to exhibit any problematic behavior or profound developmental disability, his best interests lie in being "moved to be with his tribe and his family." Her view was that "transported" children, i.e., children "that [sic] have not been *21 kept with the Indian heritage," "often end up very badly in adolescence."
The Department presented as a witness clinical psychologist, Alfredo E. Crespo, Ph.D., whose report was admitted into evidence. Dr. Crespo's report related that during his interview with the Minor and Appellants, the Minor consistently referred to Appellants as "`mamma' and `papa.'" Crespo's report observed that when Arturo G. was asked to leave the room and did so, the Minor began to cry, became "clingy," and had to be held by his foster mother while he intermittently cried for his "papa." Shortly afterward Crespo decided not to try to see the Minor alone because the Minor became "clingy" with appellant Arturo G. and "hugged him tightly while exclaiming "`papa, papa.'"
In his summary, Crespo concluded "that Santos is attached to [Appellants] and . . . he has been integrated into their lives. In my opinion the disruption of his attachment to the only family he has known will likely create intense immediate distress should the Court decide to send him to live with the Chippewa tribe's proposed prospective adoptive mother in Minnesota. The disruption of his attachment also raises long-range risk factors that create additional concerns about his future adjustment and emotional health in the event that the Court follows Dr. Noble's recommendations."
Crespo also noted that the Minor's present attachment to Appellants was insecure, probably stemming from Appellants' own insecurities as they faced the possibly of losing the Minor. But, Crespo opined, "it is quite likely that Santos['] attachment pattern may become secure in nature should the Court decide to sanction the adoption requested by his foster parents."
Citing certain professional authority, Crespo also presented definitions of "bonding" and "attachment" that differed from Noble's. For Crespo, "attachment is defined as that which stems from the child and bonding as that which stems from the caretaker." He repudiated the claim that a mother and child bond during the first few days of life.
With respect to the short-range outlook for Santos, Crespo asserted that "there is no question that the minor will be distressed by separation from the only stable and loving caregivers he has known during his life. This distress can be predicted to be additionally complicated by the prospective adoptive mother's plan for daycare, a care-taking arrangement quite different from that to which he has become accustomed in his foster home. . . . In addition, given that he has been raised in a Spanish speaking home, his attachment to his prospective adoptive Chippewa mother will be further complicated by a language barrier."
With respect to long-range prediction, Crespo stated that "there is a great and growing body of research which suggests that disrupted attachments is [sic] associated with multiple emotional and psychological problems. The loss of a mother before age 12, for example, has been found to be a predisposing factor for [depression in adult life. In my opinion, allowing the foster parents to adopt him precludes risk factors for long-term emotional problems except for those associated generally with Adoption. However, the foster parents, the foster mother in particular, have already displayed a willingness to learn more about and respect as well as celebrate Santos' Native-American heritage."
The Department's CSW was called as a witness. She testified to case activity notes for May 8, 2000, which reported a conversation the Grand Portage Reservation TSW had had with the Department's CSW. As paraphrased by the court, the *22 notes related that the TSW had said she would seek a letter from the Tribe stating its position regarding the case, that she felt that the Mother should get more reunification services, and that if the Minor could not be returned to his Mother, he could be adopted by Appellants.
Lucila G. testified briefly concerning the Minor's health problems, among them respiratory problems, which correlated with changes in the weather. She believed that the Minor suffered from asthma.
At closing argument, the Department, submitted on the court's tentative decision and "acknowledged] ICWA placement preferences."
The Minor opposed the proposed removal from his de facto family. He urged that the contemplated uprooting from his family and a change to an entirely different environment would be calamitous, and argued that his eventual connection to the Tribe did not outweigh the serious trauma from being uprooted from a loving home.
After the conclusion of testimony at the contested permanent plan hearing, the trial court terminated the parental rights of the Mother and the Father and found that the Minor was likely to be adopted. The trial court, commenting that for the Minor, "being Indian is not an optional lifestyle . . . he is a Grand Portage child ordered that the Minor be placed in the adoptive home of Jacki K., and denied Appellants' request for a stay.

APPELLANTS' CONTENTIONS
Appellants contend that:
(1) the ICWA is unconstitutional;
(2) the ICWA may not be applied constitutionally to this case because the Minor is not part of an existing Indian family, and neither he nor his mother participated in Indian tribal life;
(3) the Tribe waived its right to assert the application of the ICWA; and
(4) the court applied an incorrect standard and abused its discretion in its determination that good cause did not exist to depart from ICWA placement preferences.

DISCUSSION

I. Controlling Authority

A. The Indian Child Welfare Act
The Indian Child Welfare Act (25 U.S.C. ง 1901 et seq.) was enacted in 1978, out of an increasing concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of child welfare practices that separated large numbers of Indian children from their families and tribes, and placed them in non-Indian homes through state adoption, foster care, and parental rights termination proceedings. (Mississippi Choctaw Indian Band v. Holyfield (1989) 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29.) Testimony at pre-enactment hearings attributed the high rates of removal of Indian children from their homes to "`government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing'" (id. at p. 34, 109 S.Ct. 1597), among them the Indian practice of leaving children with persons outside the nuclear family, which often had been misinterpreted as neglect. (Id. at p. 35, fn. 4, 109 S.Ct. 1597.)
The stated purpose of the ICWA is to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster care or adoptive *23 homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. ง 1902.) The congressional findings in support of the ICWA cite the interest of the United States in protecting Indian children who are members of or eligible for membership in an Indian tribe. (25 U.S.C. ง 1901(3).)[12]
Title I of the ICWA applies to child custody proceedings[13] (25 U.S.C. ง 1903) which involve an Indian child. (Id., 25 U.S.C. ง 1903(4).) "Indian child" is defined in the Act as: "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. ง 1903(4).) The ICWA defines an Indian child's tribe as (a) an Indian tribe in which an Indian child is a member or eligible for membership, or (b), in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has the more significant contacts. (25 U.S.C. ง 1903(5).) Under the ICWA, each Indian tribe has sole authority to determine its membership criteria, and to decide who meets those criteria. (Santa Clara Pueblo v. Martinez (1978) 436 U.S. 49, 72, fn. 32, 98 S.Ct. 1670, 56 L.Ed.2d 106.) Formal membership requirements differ from tribe to tribe, as does each tribe's method of keeping track of its own membership. (Ibid.)
If, in an involuntary child custody proceeding, probable cause exists to believe that the proceeding involves an *24 Indian child within the meaning of the Act, the Indian child's tribe must be notified of the pendency of the action, and of its right to intervene. (25 U.S.C. ง 1912.) "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Department of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe." (Ibid.) Actual notice to the tribe has been found sufficient, notwithstanding failure to serve notice by registered mail. (Matter of the Dependency and Neglect of A.L. (S.D.1989) 442 N.W.2d 233, 236.) An Indian child's tribe may intervene at any point in the proceedings. (25 U.S.C. ง 1911.)
On petition of either parent or of the Indian child's tribe, state court proceedings for foster care placement or for termination of parental rights to an Indian child must be transferred to a tribal court unless "good cause exists," either parent objects, or the tribe declines jurisdiction. (25 U.S.C. ง 1911(b).) If transfer does not occur, the matter remains in state court.
ICWA contains adoptive, foster care, and preadoptive placement preferences. (25 U.S.C. ง 1915.) In any adoptive placement of an Indian child, preference shall be given, in the absence of good cause to the contrary, to a placement with: "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (25 U.S.C. ง 1915(a)); there may be a different order of preference if provided for by tribal resolution, so long as the placement is the least restrictive appropriate to the particular needs the child. (25 U.S.C. ง 1915(c).) Good cause for departure from the placement preferences is not defined. ICWA provides that, where appropriate, the preference of the Indian child or parent shall be considered. (Ibid.)
The ICWA expressly directed the Secretary of the Department of the Interior to promulgate regulations to carry out the Act within 180 days of its enactment. (25 U.S.C. ง 1952.) Instead, the Bureau of Indian Affairs (BIA) issued guidelines (Guidelines for State Courts; Indian Child Custody Proceedings, (44 Fed.Reg. 67584 (Nov. 26, 1979)), that are instructive, but not controlling or binding on state court determinations. (Id. at 67584; In re Michael G. (1998) 63 Cal.App.4th 700, 714, 74 Cal.Rptr.2d 642.)

B. California's Implementation of the Indian Child Welfare Act
California Rules of Court, rule 1439 implements the ICWA for California courts. Rule 1439 incorporates the ICWA definitions of Indian child, Indian child's tribe, and Indian tribe without modification (Cal. Rules of Court, rules 1439(a)(1), (2), (6)) and provides that the ICWA applies when a tribe determines that an unmarried minor is: (A) a member of an Indian tribe; or (B) eligible for membership in an Indian tribe and a biological child of a tribe member. (Cal. Rules of Court, rule 1439(g)(5).)
Rule 1439(f) of the California Rules of Court is virtually identical to title 25 of the United States Code section 1912 concerning the manner in which an Indian child's tribe is to be notified; it adds that notice to the tribe shall be to the tribal chairman *25 unless the tribe has designated another agent for service (Cal. Rules of Court, rules 1439(f)(1), (2)), and that notice must be sent to all tribes of which the child may be a member or eligible for membership. (Cal. Rules of Court, rule 1439(f)(3).)
Rule 1439 of the California Rules of Court provides that if the court has reason to know a child may be an Indian child within the meaning of the ICWA, the court is required to proceed as if the child is an Indian child, while at the same time conducting all dependency hearings in compliance with the timelines set forth in the Welfare and Institutions Code. (Cal. Rules of Court, rule 1439(e).)
California Rules of Court, rule 1439(k) addresses standards and preferences in placements of Indian children. "Foster and adoptive placements of Indian children must follow a specified order of preference in the absence of good cause to the contrary." (Cal. Rules of Court, rule 1439(k).) As under the ICWA, the foster or preadoptive placement must be in the least restrictive setting, within reasonable proximity to the Indian child's home, and be capable of meeting any special needs of the Indian child (Cal. Rules of Court, rule 1439(k)); the priorities for foster and preadoptive placements are identical to those stated in the ICWA, as is the ability of the tribe to alter the statutorily stated preferences by resolution. (Cal. Rules of Court, rules 1439(k)(l), (2), (6).) Rule 1439 of the California Rules of Court modifies the ICWA by adding a provision that states that an Indian child may be placed in a non-Native-American home only if the court finds that a diligent search has failed to locate a suitable Native-American home. (Cal. Rules Court, rule 1439(k)(3).) Rule 1439(k)(4) fills in the ICWA's silence regarding what constitutes good cause for deviation from placement preferences, providing that good cause to modify placement preferences may include the following considerations:
"(A) the requests of the parent or Indian custodian;
"(B) the requests of the Indian child;
"(C) the extraordinary physical or emotional needs of the Indian child as established by a qualified expert witness." (Cal. Rules of Court, rule 1439(k)(4).) Whereas the ICWA (25 U.S.C. ง 1915(c)) allows a court to consider the preferences and wishes of the Indian child and parent, rule 1439(k)(7) makes this consideration mandatory ["The preferences and wishes of the Indian child . . . shall be considered...." (Emphasis added)], without any age limitation (Cal. Rules of Court, rule 1439(k)(7)) [contrary to the age limit suggested in the BIA guidelines].

C. The Existing Indian Family Doctrine
While the stated purpose of the ICWA is to serve the best interests of the Native-American children, families, and tribes, these interests are often in tension. To address situations in which application of the ICWA is unwarranted or unconstitutional, courts have applied an analysis known as the "existing Indian family doctrine," and have declined to apply the ICWA to situations in which a child is not being removed from an existing Indian family.[14]
*26 The "existing Indian family doctrine" was first explained in Matter of Adoption Baby Boy L. (1982) 231 Kan. 199, 643 P.2d 168, which involved an out-of-wedlock child of an Indian father and a non-Indian mother. (In re Alicia S. (1998) 65 Cal.App.4th 79, 83, 76 Cal.Rptr.2d 121.) The mother had voluntarily relinquished the child at birth for adoption by a specific non-Native-American couple, whereupon the father and his tribe invoked the ICWA. In declining to apply ICWA to this situation, the Kansas Supreme Court found that the purposes of the ICWA would not be served by applying it to a situation in which the child had never been a part of an Indian home or culture: "A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from, their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." (Matter of Adoption of Baby Boy L., supra, at p. 175.)
A split of authority has developed between state courts adopting the doctrine, and those declining to do so. Following Kansas's lead, numerous state courts adopted the "existing Indian family doctrine," refusing to apply the Act where its purpose, the improper removal of Indian children from their Indian families, would not be served. Other states rejected the doctrine, primarily based on a plain language statutory construction of the Act. According to these courts, a narrow focus on the interests of a particular existing family failed to recognize the broader interests of the Indian tribe in preserving tribal culture.
The single United States Supreme Court case addressing the Act, Mississippi Choctaw Indian Band v. Holy field, supra,(Holyfield), 490 U.S. 30, 109 S.Ct. 1597 involved the question whether twin children, whose parents lived on a reservation and traveled to a distant town to give birth to them and relinquish them, were "domiciled" on the reservation within the meaning of the Act. Some courts have construed Holyfield as having raised questions about the continuing viability of the "existing Indian family doctrine" as defined by Baby Boy L. and its progeny, while other courts have construed Holyfield as being limited to its facts, and having no effect on the "existing Indian family doctrine."
At present, 10 states have adopted the doctrine, six have rejected it, and the position of the remaining states is unclear.[15]
*27 Congress considered amending the ICWA to preclude application of the "existing Indian family doctrine" but did not do so.[16] The United States Supreme Court has denied certiorari in two cases involving the "existing Indian family doctrine,"[17] one from Division Three of this district of the California Court of Appeal, In re Bridget R. (1996) 41 Cal.App.4th 1483, 49 Cal.Rptr.2d 507 (Bridget R.).

1. California's Application of the "Existing Indian Family" Doctrine
California courts initially rejected the "existing Indian family doctrine." In In re Junious M. (1983) 144 Cal.App.3d 786, 193 Cal.Rptr. 40, the juvenile court had refused to apply ICWA notification requirements in a proceeding to terminate parental rights under former Civil Code section 232, based in part on the juvenile court's determination that the minor "had developed no identification as an Indian." (In re Junious M., supra, at p. 796, 193 Cal. Rptr. 40.) The First District reversed, commenting that "[t]he language of the Act contains no such exception to its applicability, and we do not deem it appropriate to create one judicially." (Ibid.)
This District first considered the "existing Indian family doctrine" in In re Wanomi P. (1989) 216 Cal.App.3d 156, 264 Cal. Rptr. 623, in the context of a dependency proceeding to determine custody of a child born in California to a member of a Canadian Indian tribe. In reversing the trial court's determination that the ICWA applied so as to deprive the California court of jurisdiction, Division One noted in dictum: "Regulating the unwarranted removal of children from Indian families by nontribal public and private agencies was among the objectives of the ICWA as stated in the legislative findings. (25 U.S.C.A. 1901(4).) No evidence suggested the existence of an `Indian home' existed [sic] from which the minor was `removed.' ([Citation.]: For a tribal court to have exclusive jurisdiction over a child custody proceeding involving [an] Indian child, under the ICWA the child must be [a] member of an existing Indian family.)" (In re Wanomi P., supra, at p. 168, 264 Cal.Rptr. 623.)
In 1991, the First District re-visited the "existing Indian family doctrine," post-Holyfield, in Adoption of Lindsay C. (1991) *28 229 Cal.App.3d 404, 280 Cal.Rptr. 194, an action in which the stepfather of a child who had been born out of wedlock to a non-Indian mother and an Indian father had filed, with the mother's consent, a petition to adopt the child. Notice had been given to the father, who was a full-blooded Indian, but not to his tribe. Finding true the petition's allegations that the father had willfully failed to communicate with the child and had failed to pay child support, the court terminated the father's parental rights and directed that the adoption proceedings go forward without his consent. The First District reversed on the ground that the ICWA applied, since the proceeding was a child custody proceeding within the meaning of ICWA, the child was an Indian child within the meaning of ICWA, the father's tribe was a recognized tribe within the meaning of the ICWA, and the child was eligible for membership in the tribe.
Five years later, in In re Bridget R., supra, 41 Cal.App.4th 1483, 49 Cal.Rptr.2d 507, Division Three of this District rejected the traditional formulation of the "existing Indian family doctrine," which precluded application of the ICWA to an Indian child who had not lived in an Indian family. At the same time, it held that recognition of the existing Indian family doctrine was necessary under the facts of the case in order to preserve the constitutionality of the ICWA.
Bridget R. involved two-year-old twin children whose parents had voluntarily relinquished them for adoption shortly after their birth. Although the parents had originally informed the adoption agency that they had no Indian heritage, the father later told the parties that he was of Indian descent. The parents then invoked the ICWA in an attempt to invalidate their relinquishments, have the children removed from the adoptive parents with whom they had lived since birth, and have the children placed with a member of the father's extended Indian family. In a decision that held the ICWA to be unconstitutional as applied, Division Three reversed the trial court's ruling that vacated the parents' relinquishments. The court held that "under the Fifth, Tenth and Fourteenth Amendments to the United States Constitution, ICWA does not and cannot apply to invalidate a voluntary termination of parental rights respecting an Indian child who is not domiciled on a reservation, unless the child's biological parent, or parents, are not only of American Indian descent, but also maintain a significant social, cultural or political relationship with their tribe." (Bridget R., supra, 41 Cal.App.4th at p. 1492, 49 Cal.Rptr.2d 507.)
In arriving at the conclusion that the ICWA would be unconstitutional as applied, Division Three analyzed the constitutional principles, which govern family rights, ultimately concluding that children hold fundamental rights and interests in family relationships which are of constitutional dimension and which do not necessarily depend on the existence of a biological relationship. (Bridget R., supra, 41 Cal.App.4th at pp. 1505-1506, 49 Cal. Rptr.2d 507.)
The court noted that: "prior judicial decisions establish that, where a child has formed familial bonds with a de facto family with whom the child was placed owing to a biological parent's unfitness [citation] . . . and where it is shown that the child would be harmed by any severance of those bonds, the child's constitutionally protected interests outweigh those of the biological parents." (Bridget R., supra, at p. 1506.) Where the interests of an Indian tribe, which are based solely on the ICWA, interfere with the child's fundamental rights to be secure in a permanent home, the ICWA becomes constitutionally suspect, *29 and must be subjected to strict scrutiny, under which it must be found to serve a compelling governmental interest and to be actually necessary and effective in accomplishing that purpose. (Id. at pp. 1506-1507, 49 Cal.Rptr.2d 507.)
In Bridget R., the Court found the ICWA to have met the first prong of the strict scrutiny test, acknowledging the preservation of American Indian culture to be a compelling interest. It found, however, that the second prong of the strict scrutiny test was not met, because applying the ICWA was not actually necessary and effective in preserving Indian culture. The court agreed with the line of cases following the Kansas Supreme Court case of the Matter of Baby Boy L., supra, that the purpose of preserving American Indian culture would not be served by applying ICWA to children whose biological parents did not have a "significant social, cultural, or political relationship with an Indian community." (Bridget R., supra, 41 Cal. App.4th at p. 1507, 49 Cal.Rptr.2d 507.) "It is almost too obvious to require articulation," the Court commented, "`that the unique values of Indian culture' [citation] will not be preserved in the homes of parents who have become fully assimilated into non-Indian culture." (Ibid.) Thus, the Court concluded, absent a showing by the parents of significant social, cultural, or political ties with their Indian heritage, applying the ICWA to remove the children from a home in which they had formed familial bonds would violate the children's substantive due process rights. Under the circumstances of assimilated parents and a child who has become part of a loving family, the ICWA "can serve no purpose which is sufficiently compelling to overcome the child's fundamental right to remain in the home where he or she is loved and well cared for, with people to whom the child is daily becoming more and more attached by bonds of affection and among whom the child feels secure to learn and grow." (Id. at pp. 1507-1508, 49 Cal. Rptr.2d 507.)
In Bridget R., Division Three also subjected the ICWA to an equal protection analysis, and again found the ICWA unconstitutional as applied. Starting from the indisputable proposition that the ICWA requires Indian children who cannot be cared for by their natural parents to be treated differently from non-Indian children who are similarly situated, the Court observed that as a result of the disparate treatment mandated by the Act, fewer adoptive homes are available to an Indian child, and an Indian child who has been placed in an adoptive or potential adoptive home is at greater risk than a non-Indian child of being removed from that home and being placed with strangers. The Court held that "[t]o the extent this disparate and sometimes disadvantageous treatment is based upon social, cultural or political relationships between Indian children and their tribes, it does not violate the equal protection requirements of the Fifth and Fourteenth Amendments. [Citations.] However, where such social, cultural or political relationships do not exist or are very attenuated, the only remaining basis for applying ICWA rather than state law in proceedings affecting an Indian child's custody is the child's genetic heritageโin other words, race." "`[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests.' [Citations.]" (Bridget R., supra, 41 Cal.App.4th at p. 1508, 49 Cal.Rptr.2d 507.) The Court rejected the contention that the ICWA does not create a race-based classification because application of *30 the Act triggered by the child's membership in the Tribe, holding that "any application of ICWA which is triggered by an Indian child's genetic heritage, without substantial social, cultural or political affiliations between the child's family and a tribal community, is an application based solely, or at least predominantly, upon race and is subject to strict scrutiny under the equal protection clause. So scrutinized, and for the same reasons set forth in our discussion of the due process issue, it is clear that ICWA's purpose is not served by an application of the Act to children who are of Indian descent, but whose parents have no significant relationship with an Indian community. If ICWA is applied to such children, such application deprives them of equal protection of the law." (Bridget R., supra, at pp. 1509-1510.)
The third aspect of the analysis in Bridget R. was a discussion of the Indian commerce clause "The Congress shall have power . . . [ถ]. . . [ถ] . . . t[o] regulate commerce . . . commerce with the Indian tribes" (U.S. Const., art. I, ง 8, cl.3), under which the ICWA was enacted, in relation to interstate commerce clause, "The Congress shall have power . . . [ถ] . . . [ถ] . . . t[o] regulate . . . commerce . . . among the several states . . ." (ibid.), and the Tenth Amendment of the Constitution. Division Three noted that, although the reach of the Indian and interstate commerce clauses are not identical, it found applicable to the Indian commerce clause the recent instruction of United States v. Lopez (1995) 514 U.S. 549, 115 S.Ct. 1624 which had found the Gun Free School Zone Act (18 U.S.C. ง 922(q)(l)(A)) to have been beyond Congressional power to enact under the interstate commerce clause, because the statute did not regulate activity that substantially affected interstate commerce. (Bridget R., supra, 41 Cal.App.4th at p. 1511, 49 Cal.Rptr.2d 507.) Since jurisdiction over family relations is traditionally a power reserved to the states, and since Lopez taught that Congress exceeds its authority when, acting under an enumerated power, it legislates in matters generally reserved to the states, in the absence of a substantial nexus between the enumerated power and the matter regulated, it followed that in order for a federal law to override state law on a matter of family relations, it must be shown that application of the state law would do "`major damage'" to ""clear and substantial" federal interests." (Id. at p. 1510, 49 Cal. Rptr.2d 507, citing Rose v. Rose (1987) 481 U.S. 619, 625, 107 S.Ct. 2029, 95 L.Ed.2d 599.) The Court concluded that since no substantial nexus existed between the Indian commerce clause and child custody proceedings involving children whose families did not maintain significant relationships with an Indian tribe, community, or culture, application of the ICWA to such children would impermissibly intrude upon a power reserved to the states. (Bridget R., supra, 41 Cal.App.4th at p. 1511, 49 Cal.Rptr.2d 507.)
Bridget R. was followed by the Fourth District case of In re Alexandria Y. (1996) 45 Cal.App.4th 1483, 53 Cal.Rptr.2d 679, which applied the "existing Indian family doctrine" to a proceeding to terminate parental rights and implement a pre-adoptive placement. affirming the trial court's refusal to apply the ICWA so as to require a Native-American adoptive placement, where neither the child nor the enrolled tribe member mother had any significant social, cultural, or political relationship with Indian life, the Fourth District held that "recognition of the existing Indian family doctrine [was] necessary to avoid serious constitutional flaws in the ICWA" (In re Alexandria Y, supra, 45 Cal. App.4th at p. 1493, 53 Cal.Rptr.2d 679), and held that the trial court had acted properly in refusing to apply the ICWA *31 "because neither [the child] nor [the mother] had any significant social, cultural, or political relationship with Indian life; thus, there was no existing Indian family to preserve." (Id. at p. 1485, 53 Cal.Rptr.2d 679.) The court observed that not only did neither the mother nor the child have any relationship with the tribe, but also that the father was Hispanic, and that the child was placed in a preadoptive home where Spanish was spoken. "Under these circumstances," the court commented, "it would be anomalous to allow the ICWA to govern the termination proceedings. It was clearly not the intent of the Congress to do so." (Id. at p. 1494, 53 Cal.Rptr.2d 679.) The Alexandria Y. court suggested that the holding in Bridget R. was too narrow, and remarked that under some circumstances the "existing Indian family doctrine" properly might foreclose application of the ICWA to a case in which one of the parents, or even the child, had maintained at least some involvement in Indian life.
The following year, in Crystal R. v. Superior Court (1997) 59 Cal.App.4th 703, 69 Cal.Rptr.2d 414, the Sixth District applied the "existing Indian family doctrine" to a proceeding to terminate parental rights of a father who was an enrolled tribe member. The juvenile court had found the ICWA applicable to the case, whereupon the minor and her de facto parents, joined by the social service agency, filed a writ petition seeking to preclude application of the ICWA. The Sixth District granted the petition, and directed the trial court to conduct a hearing in which the father and the tribe bore the burden of proof, by preponderance of the evidence, of proving that the father had maintained significant ties with the tribe.
In 1998, in In re Alicia S. (1998) 65 Cal.App.4th 79, 76 Cal.Rptr.2d 121, the Fifth District rejected a trial court application of the "existing Indian family doctrine" in a proceeding terminating a mother's parental rights with respect to her three children, where the mother was three-eights Paiute Indian, and an enrolled member of the Paiute tribe, and the children's father was one-half Pima Indian and an enrolled member of an Arizona Indian community. The juvenile court had found the ICWA to be inapplicable under the "existing Indian family doctrine," holding that neither parent had a significant relationship to the Indian community. The Fifth District reversed, holding that the dependency proceedings were required to be conducted in conformity with the ICWA, based on the plain language of the statute. The court stated that the "existing Indian family doctrine" "conflicts with the ICWA's policy of protecting and preserving the interests of Indian tribes in their children . . . and undermines the ICWA's purpose to establish uniform federal standards governing the removal of Indian children from their families." (Id. at p. 90, 76 Cal.Rptr.2d 121.) The court discussed the parents' involvement with tribal gatherings, elections, funerals, powwows, "sweats," and other Native-American customs, as well as efforts the mother had made to make her children aware of their Native-American heritage, commenting that "this is not a case where `Indian children' have been removed from a home having no connection whatsoever to the Indian community."
The Fifth District noted that the trial court was left to decide, without guidance or expertise, whether "the parents' Indian activities and beliefs were `significant' enough to warrant application of the ICWA . . . returning Indian child custody proceedings to a . . . time . . . when "`Indian children [were] removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating . . . Indian *32 home life and childrearing.'"" (In re Alicia S., supra, 65 Cal.App.4th at p. 91, 76 Cal.Rptr.2d 121.) Although the court commented that "a dependent child's interests in permanence and stability . . . may in some cases outweigh the competing interests of parents and tribe" (id. at p. 88, 76 Cal.Rptr.2d 121), it did not address the constitutional analysis of Bridget R.
In In re Derek W. (1999) 73 Cal.App.4th 828, 86 Cal.Rptr.2d 742, this district again considered the "existing Indian family doctrine" in the context of dependency proceedings. The minor had been born with a positive toxicology screen, was removed from the custody of his parents, and adjudicated a dependent. Reunification efforts failed. At the hearing to terminate parental rights, the minor's father testified that he was concerned about the minor's potential adoption by the foster family with whom the minor had been living since birth, because the family was Caucasian, and the minor was mixed race. The father also stated, for the first time, that he was part Cherokee Indian. The father's Indian heritage was not raised again until a petition for writ of error coram vobis, in which the father contended that the ICWA applied, and he represented that his ancestry was more than three-quarters American Indian. He related that his parents were Cherokee Indians of the "Smokey Mountain Tribe," with close ties to a particular reservation, that he frequently had visited the reservation as a child, and that he once became a blood brother of a Cherokee boy who lived on the reservation. Denying the petition on both procedural grounds and on the merits, the court found as a matter of law that there was no "existing Indian family" (id. at p. 833, 86 Cal.Rptr.2d 742), since the father had provided no evidence that he was part of an existing Indian family nor that he had provided such an Indian family to Derek.

2. Section 360.6
In 1998 the California Legislature addressed the "existing Indian family doctrine" by enacting section 360.6 to the Welfare and Institutions Code. Section 360.6 subdivision (c), provides[18] that "a determination by an Indian tribe that a person under the age of 18 is either (1) a member of an Indian tribe or (2) eligible for membership in an Indian tribe and a biological child of a member of a tribe shall constitute a significant political affiliation with the tribe and require application of the federal Indian Child Welfare Act to the proceedings." Subdivision (c) uses language identical to that defining an "Indian child" in the ICWA. An "Indian child" is: "an unmarried person under the age of 18 *33 who is either (a) a member of an Indian tribe, or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. ง 1903.) Thus, the same criteria that define an "Indian child" under the ICWA define an "Indian child with a significant political relationship with a tribe" under section 360.6 subdivision (c).
Section 360.6 was enacted as a legislative response to the holding of In re Bridget R.[19] that "under the Fifth, Tenth and Fourteenth Amendments to the United States Constitution, ICWA does not and cannot apply to invalidate a voluntary termination of parental rights respecting an Indian child who is not domiciled on a reservation, unless the child's biological parent, or parents, are not only of American Indian descent, but also maintain a significant social, cultural or political relationship with their tribe." (Bridget R., supra, 41 Cal.App.4th. at p. 1492, 49 Cal. Rptr.2d 507.)

II. Constitutionality of the ICWA as Applied
Appellants contend that the ICWA is unconstitutional on its face and unconstitutional as applied. They assert that application of the ICWA to an individual who is in all respects, except in genetic heritage, indistinguishable from other residents of this state violates the Fifth, Tenth, and Fourteenth Amendments to the United States Constitution. We agree. Because we find that the ICWA is unconstitutional as applied, we decline to address the general constitutionality of that statute.
With respect to the application of the ICWA, the salient facts are these: The Minor was born in Los Angeles County and has been in placement since birth. At the age of three months, he was placed in the home of Appellants, whom he knows as his mother and father. Appellants had planned to adopt the Minor in the event that the parents' reunification failed, as it did. The Minor wants to be adopted by Appellants, and opposes being moved to an adoptive home on the Tribe's reservation in Minnesota. While the psychologist experts who evaluated the Minor disagreed concerning the long-term damage to be suffered by him were he to be removed from his home with Appellants, they agreed that such a move, at least in the short-term, would be extremely distressing to him.
The Minor is multi-ethnic.[20] His association with the Minnesota Chippewa Tribe is as a person of "one-quarter Chippewa Indian blood" and as the biological child of his Mother. His lifetime face-to-face interaction with the Mother has been minimal. She visited a few times before resuming residence in Oregon, and visited again while she was in Los Angeles during August 2000.
The Mother was enrolled in the Tribe as a child. The Mother has lived as an adult *34 in Oregon and California.[21] Her only relatives known to be associated with the Tribe are a first cousin, JoAnne B., and a third cousin, Jacki K., the Tribe's prospective adoptive mother for the Minor. The record contains no indication that the Mother had ever met JoAnne B. or Jacki K. The Mother's closest relatives, her husband, daughter, half-sister, and maternal grandparents, live in the Los Angeles area.
The record does not show any involvement by the Mother with the Tribe prior to the Mother having been informed about the ICWA and having been given a contact number for the Tribe by the Department's CSW.
Membership in the Chippewa Tribe is determined by Tribal "blood." The Revised Constitution and Bylaws of the Minnesota Chippewa Tribe, Minnesota (Chippewa Constitution or Const.) provide,[22] in relevant part, that all children of at least one-quarter degree Minnesota Chippewa Indian blood born to a member after July 3, 1961, are eligible for membership, provided application takes place within a year of birth. (Chippewa Const, art. I, ง 1(c).) The Constitution also provides for admission to the Tribe of a "person of Minnesota Chippewa Indian blood" who meets the membership requirements, but has not been enrolled due to some error. (Chippewa Const., art., I, ง 3.) Thus, the time limits in which a member may be enrolled are not necessarily binding, but the membership requirement of "at least one quarter (ผ) degree Minnesota Chippewa Indian blood" is inviolate. The Constitution does not allow adopted children of Tribe members to qualify for membership in the Tribe. A minimum of one-quarter Minnesota Chippewa Indian blood is, thus, the determining factor for membership in the Tribe.
The Tribe deems the Minor eligible for enrollment.

A. Substantive Due Process
Family rights are afforded substantive protection under the due process clause of the Fifth and Fourteenth Amendments. (Santosky v. Kramer (1982) 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599.)[23] The United States Supreme Court "`has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' [Citation.]" (Moore v. East Cleveland (1977) 431 U.S. 494-499, 97 S.Ct. 1932, 52 L.Ed.2d 531.) As this district of the Court of Appeal discussed in Bridget R., both the United States and California Supreme Courts have recognized that an individual's rights respecting family relationships do not necessarily depend upon the existence of a biological connection, and that interests in familial ties which grow between members of a de facto family may outweigh biological relationships in some circumstances. (In re Bridget R., supra, 41 *35 Cal.App.4th at p. 1505, 49 Cal.Rptr.2d 507.)
The United States Supreme Court has issued several opinions establishing that children are constitutionally protected actors. "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." (In re Gault (1967) 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527.) "`Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.' [Citation.]" (Troxel v. Granville (2000) 530 U.S. 57, 89, fn. 8, 120 S.Ct. 2054, 147 L.Ed.2d 49 (dis. opn. of Stevens, J.).)[24] While the United States Supreme court has reserved the issue of deciding the nature of a child's liberty interests in preserving established familial or family-like bonds (Michael H. v. Gerald D. (1989) 491 U.S. 110, 130, 109 S.Ct. 2333, 105 L.Ed.2d 91), our Supreme Court has declared that "[c]hildren . . . have fundamental rightsโincluding the fundamental right . . . to `have a placement that is stable, [and] permanent.'" (In re Jasmon O., supra 8 Cal.4th 398, 419, 33 Cal. Rptr.2d 85, 878 P.2d 1297, quoting from In re Marilyn H., (1993) 5 Cal.4th at p. 306, 19 Cal.Rptr.2d 544, 851 P.2d 826.) California recognizes that "[c]hildren are not simply chattels belonging to their parent, but have fundamental interests of their own. . . ." (In re Jasmon O. (1994) 8 Cal.4th 398, 419, 33 Cal.Rptr.2d 85, 878 P.2d 1297), and that these interests are of constitutional dimension. (In re Bridget R., supra, at p. 1490.) Prior to Marilyn H., Jasmon O., and Bridget R., in In re Arturo A. (1992) 8 Cal.App.4th 229, 10 Cal.Rptr.2d 131, California case law "[a]dopt[ed] the proposition that a child has a constitutional right to a reasonably directed early life, unmarked by unnecessary and excessive shifts in custody. . . ." (Id at p. 242, fn. 6, 10 Cal.Rptr.2d 131.)
As noted in Bridget R., the right of a child to a familial relationship is "[i]f anything, . . . more compelling than adults', because children's interests in family relationships comprise more than the emotional and social interests which adults have in family life; children's interests also include the elementary and wholly practical needs of the small and helpless to be protected from harm and to have stable and permanent homes in which each child's mind and character can grow, unhampered by uncertainty and fear of what the next day or week or court appearance may bring. [Citation.]" (In re Bridget R., supra, 41 Cal.App.4th at p. 1504, 49 Cal. Rptr.2d 507.)
Legislation which substantially interferes with the enjoyment of a fundamental right is subject to strict scrutiny (Sherbert v. Verner (1963) 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965), i.e., it must be set aside or limited unless it serves a compelling purpose and is necessary to the accomplishment of that purpose. Thus, application of the ICWA that fundamentally interferes with the Minor's right to retain his existing stable familial relationships requires that the statute be subjected to strict scrutiny to determine whether, as applied, it serves a compelling government purpose and, if so, whether its application is actually necessary and effective to the accomplishment of that purpose. (In re Bridget R., supra, 41 Cal. App.4th at p. 1507, 49 Cal.Rptr.2d 507.)
*36 The test we apply is: (1) whether the tribal interests which the ICWA protects are sufficiently compelling under substantive due process standards to justify the impact implementation of ICWA's placement preferences would have on the Minor's constitutionally protected familial rights in his de facto family and, if so, (2) whether the application of ICWA, under the facts of this case, is necessary to further that interest. We do not disagree with the proposition that preserving Native-American culture is a significant, if not compelling, governmental interest. We do not, however, see that interest being served by applying the ICWA to a multi-ethnic child who has had a minimal relationship with his assimilated parents, particularly when the tribal interests "can serve no purpose which is sufficiently compelling to overcome the child's fundamental right to remain in the home where he . . . is loved and well cared for, with people to whom the child is daily becoming more attached by bonds of affection and among whom the child feels secure to learn and grow." (In re Bridget R., supra, 41 Cal. App.4th at p. 1508, 49 Cal.Rptr.2d 507.)
The Minor is a party (ง 317.5, Subd.(b)), represented by counsel charged with advocating his independent interests (ง 317, subds.(c), (e)). He has defined his best interests as remaining with his de facto family.
There is no Indian family here to preserve. The Mother's contacts with the Minor were limited to a few visits before she moved back to Oregon, visits during August 2000, while Dr. Noble's evaluation was pending, a couple of letters, and daily and weekly phone calls from Oregon which began in May 2000, when the Minor was 18 or 19 months old, in which the Mother would talk to the Minor until he hung up.
The Mother's connection with the Tribe is predicated on her enrollment, but she has lived a half continent away from the Tribe's activities and culture as an adult. The record does not indicate that she had any connection with the Tribe prior to the Department's CSW giving her a contact number.
The Minor's sole connection with the Tribe is a one-quarter "Minnesota Chippewa Tribe" genetic contribution from an enrolled bloodline, and enrollment based on that genetic contribution. While placing the Minor for adoption on the Grand Portage Reservation would, in the most attenuated sense, promote the stability and security of the Tribe by providing one more individual to carry on Minnesota Chippewa cultural traditions, we find the "repatriation" to the Tribe of a child of assimilated parents, solely because of the child's one-quarter Minnesota Chippewa Tribe genetic heritage, to be a constitutionally impermissible application of the statute.
The length of time the Minor has been in his de facto family plays a significant role in our determination. Our Supreme Court has held that when reunification services to the parents are terminated, a critical juncture is reached in which the child's interests in a stable placement become paramount, outweighing the fundamental, constitutionally protected interest of his biological parents in their relationship with him. (In re Marilyn H., supra, 5 Cal.4th 295, 308, 19 Cal. Rptr.2d 544, 851 P.2d 826.) When the Minor's interest outweighs the constitutionally protected interest of a biological parent, it necessarily outweighs the interest of a tribe, whose interest is solely a creature of statute.
Section 360.6 does not change our analysis. Notwithstanding the declaration that "the State of California has an interest in protecting Indian children who *37 are members of, or eligible for membership in, an Indian tribe" (ง 360.6, subd. (a)(1)), California has no independent Constitutional authority with respect to Indian tribes. "`Indian relations [are] . . . the exclusive province of federal law.'" (Seminole Tribe of Fla. v. Florida (1996) 517 U.S. 44, 60, 116 S.Ct. 1114, 134 L.Ed.2d 252.) "The whole intercourse between the United States and this nation is, by our constitution and law, vested in the government of the United States." (Worcester v. The State of Georgia (1832) 31 U.S. 515, 561, 6 Pet. 515, 8 L.Ed. 483.) While jurisdiction over matters of family relations is traditionally reserved to the states, California has no independent state interest with respect to the family relations of members of federally recognized Indian tribes. It is Congress that has a constitutionally based and unique relationship with federally recognized Indian Tribes (U.S. Const., art. I,ง8, cl.3), not the states.
To the extent that section 360.6 may be deemed to be an incorporation by reference of the ICWA, the issue remains that of whether the ICWA embodies a compelling state interest that is closely tailored to the purpose of Congress' enactment as applied to this child. For the reasons discussed above, we find that it does not.

B. Equal Protection
The dependency statutes embody three primary goals for children adjudged dependents of the juvenile court: (1) to protect the child (งง 202; 300.2; 361, subd. (c)(1); 361.2, subd. (a); 361.3, subd. (a)(8); 366.21, subd. (e); 16500); (2) to preserve the family and safeguard the parents' fundamental right to raise their child, as long as these can be accomplished with safety to the child (งง 202; 300.2; 361.5, subd. (a)); and (3) to provide a stable, permanent home for the child in a timely manner. (งง 366.26; 358.1, subd. (b); 396; 16131; 16501.1, subd. (f)(9).) Appellants contend that application of the ICWA to the Minor deprives him of equal protection of these statutes.
The ICWA unquestionably requires Indian children who are dependents of the juvenile court to be treated differently from court dependents who are not Indian children. As we observed in Bridget R., and is demonstrated here, because fewer foster and adoptive homes are potentially available to an Indian child than are available to non-Indian children, an Indian child in foster or foster-adoptive placement is at greater risk of forming family attachments, only to have them disrupted. In the Minor's case, application of the ICWA resulted in the Minor being subjected to repeated deferrals of the implementation of a permanent plan for him. These delays culminated in the court ordering him removed from the care of foster parents, who wanted to adopt him, for no reason other than that the foster parents were not of Native-American ancestry. Had the juvenile court not deemed the ICWA to apply to the Minor, it is likely that he would have been adopted by Appellants by December 1999, close to his first birthday.
To the extent such disparate treatment is based upon social, cultural, or political relationships between an Indian child and its tribe, it is consistent with the equal protection requirements of the Fifth and Fourteenth Amendments. (Bridget R., supra, 41 Cal.App.4th 1483, at p. 1508, 49 Cal.Rptr.2d 507.) Absent social, cultural, and political relationships, or where the relationships are very attenuated, the only basis for applying ICWA rather than state law in dependency proceedings is the child's genetic heritage. (Ibid.) This is what occurred here.
*38 The United States Supreme Court has enunciated three standards of review for analyzing constitutional equal protection challenges, two of which are relevant to our analysis. For legislation concerning a "suspect" classification involving an immutable characteristic, such as race, ethnicity, or ancestry, courts have been directed to apply strict scrutiny and to uphold the legislation only if its classification is precisely tailored to further a compelling governmental interest. (Adarand Constructors, Inc. v. Pena (1995) 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (Adarand).) Over the years, the United States Supreme Court "has consistently repudiated `[distinctions between citizens solely because of their ancestry' as being `odious to a free people whose institutions are founded upon the doctrine of equality.'" (Loving v. Virginia (1967) 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010, citing Hirabayashi v. United States (1943) 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774.)
The Tribe and amici contend that the ICWA involves a political classification, and is therefore subject to the rational basis level of scrutiny generally applied to economic regulation and other classifications in which the conditions for the higher levels of review are absent. (Romer v. Evans (1996) 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855.) They rely on Morton v. Mancari (1974) 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (Mancari), which involved a Bureau of Indian Affairs (BIA) preference in employment which favored individuals who were "one-fourth or more degree Indian blood and . . . members] of a Federally-recognized Indian tribe." (Id. at p. 553, fn. 24.) In Mancari, the Court found that although the preference had a racial component, it was "not even a `racial' preference. Rather it is an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups. It is directed to participation by the governed in the governing agency . . . similar in kind to the constitutional requirement that a United States Senator, when elected, be `an Inhabitant of that State for which he shall be chosen. . . ."' (Mancari, supra, at pp. 553-554, 94 S.Ct. 2474.) The opinion stated that the preference "is not directed towards a `racial' group consisting of `Indians'; instead, it applies only to members of `federally recognized' tribes. This operates to exclude many individuals who are racially to be classified as `Indians.' " (Id. at p. 553, fn. 24, 94 S.Ct. 2474.) "In this sense," the Court said, "[t]he preference is political rather than racial in nature." (Ibid.) The Court emphasized that "the preference applies only to employment in the Indian service. The preference does not cover any other Government agency or activity, and we need not consider here the obviously more difficult question that would be presented by a blanket exemption for Indians from all civil service examinations." (Id. at p. 554, 94 S.Ct. 2474.) The Court applied the rational basis test to the hiring preference, finding that the preference could be "tied rationally to the fulfillment of Congress' unique obligation toward the Indians," and that it was "reasonable and rationally designed to further Indian self-government. (Id. at p. 555, 94 S.Ct. 2474.) In a later discussion of Mancari, the Court remarked that "[t]he opinion was careful to note . . . that the case was confined to the authority of the BIA, an agency described as `sui generis.' [Citation.]" (Rice v. Cayetano (2000) 528 U.S. 495, 520, 120 S.Ct. 1044,145 L.Ed.2d 1007.)
In Adarand Constructors, Inc. v. Pena, supra, 515 U.S. at page 200, 115 S.Ct. 2097, the Supreme Court found federal contracting race-based presumptions favorable *39 to minorities[25] to be subject to strict scrutiny under the Due Process Clause of the Fifth Amendment. The court defined three basic propositions of equal protection jurisprudence: (1) skepticismโthat any preference based on racial or ethnic criteria requires searching examination and is inherently suspect; (2) consistencyโthat the standard of review is not dependent on the race of those burdened or benefited by a particular classification; and (3) congruenceโequal protection analysis under the Fifth Amendment to the Constitution is the same as under the Fourteenth. (Id at pp. 223-224, 115 S.Ct. 2097.)
Justice Stevens dissented on several grounds in Adarand among them that the majority's concept of consistency would subject preferences for Native-Americans to the same scrutiny as invidious discrimination against minorities: "We should reject a concept of `consistency' that would view the special preferences that the National Government has provided to Native-Americans since 1834 as comparable to the official discrimination against African Americans that was prevalent for much of our history." (Id. at pp. 244-245,115 S.Ct. 2097, fn. omitted, (Stevens, J. dissenting).) Citing to Mancari, Justice Stevens pointed out that Mancari's conclusion, that the classification "`one fourth or more degree Indian blood and be a member of a Federally-recognized tribe'" was not racial because it did not encompass all Indian tribes, was parallel to the argument rejected by the majority in Adarand, that the small business preference was not racial, because not all members of the preferred minority groups were eligible for the preference. (Id. at. pp. 244-245, fn.3.) Justice Stevens also commented on the parallel between Mancari's reliance on the plenary power of Congress to legislate on behalf of Indian tribes, and the respondents' reliance on the power granted to Congress under section 5 of the Fourteenth Amendment to legislate on behalf of minorities.
Post-Adarand Ninth Circuit cases have focused on the text of the Mancari, rather than the footnote language characterizing the BIA preference as more political than racial, and have limited application of the rational basis test to legislation involving uniquely Indian concerns. (Dawavendewa v. Salt River Project Agr. Imp. (9th Cir.1998) 154 F.3d 1117; Williams v. Babbitt (9th Cir.1997) 115 F.3d 657, 661; Malabed v. North Slope Borough (D. Alaska, 1999) 42 F.Supp.2d 927.) We do likewise, and do not find child custody or dependency proceedings to involve uniquely Native-Americans concerns.
As stated in Bridget R., "Any application of ICWA which is triggered by an Indian child's genetic heritage, without substantial social, cultural or political affiliations *40 between the child's family and a tribal community, is an application based solely, or at least predominantly, upon race and is subject to strict scrutiny under the equal protection clause." (Bridget R., supra, 41 Cal.App.4th at p. 1509, 49 Cal. Rptr.2d 507.) The test we apply is whether the classification serves a "compelling governmental interest" and is "narrowly tailored" to achieve its goal. (Adarand Constructors, Inc. v. Pena, supra, 515 U.S. 200 at p. 226, 115 S.Ct. 2097, 132 L.Ed.2d 158.)
The facts upon which we relied in concluding that application of the ICWA to this Minor constituted a violation of substantive due process lead to the conclusion that application of the ICWA to the Minor constitutes a violation of equal protection of the laws under the Fifth and Fourteenth Amendments to the United States Constitution. The record reflects that the Minor has no association with the Tribe other than genetics, i.e., his one-quarter "Minnesota Chippewa blood" from an enrolled bloodline of the Tribe. Whether we characterize this genetic association as racial, ethnic, or ancestry,[26] a determination based on "blood," on its face invokes strict scrutiny to determine whether the classification serves a compelling governmental interest and is narrowly tailored to achieve that interest. We find that it does not.
The enactment of section 360.6 does not alter the outcome of an equal protection analysis. As we discussed earlier, California has no independent constitutional authority authorizing it to enact legislation governing federally recognized Indian tribes. Moreover, to the extent that section 360.6 could be viewed as incorporating the ICWA, incorporation could not result in any lesser level of scrutiny than would be required absent the incorporation.
Section 360.6, were it otherwise valid, would require application of the ICWA to the Minor solely due to Tribe's determination that the Minor was "eligible for membership in [the] Indian tribe and a biological child of a member of [the] Tribe." (Welf. & Inst.Code, ง 360.6, subd. (c)(1).) Since the Minor's eligibility for membership in the Tribe arises exclusively from his having a sufficient quantum (one-quarter) "Minnesota Chippewa blood" (Chippewa Constitution, art. I, ง 1(c)) and his birth to a Tribe member (ibid.), section 360.6 would not alter the uncontroverted fact that application of the ICWA to Minor would be due solely to his one-quarter enrolled-bloodline "Minnesota Chippewa blood." Under these circumstances strict scrutiny would be compelled, and section 360.6 would fail the test of a serving a compelling state interest, narrowly tailored to achieve that interest.

C. The Tenth Amendment
As we discussed in Bridget R., the Supreme Court has indicated that Congress exceeds its enumerated authority when it legislates in matters generally left to the jurisdiction of the states unless the legislation bears a substantial nexus to the enumerated power under which the legislation is enacted. (Bridget R., supra, 41 Cal.App.4th at pp. 1510-1511, 49 Cal.Rptr.2d 507.) Since Bridget R., the Supreme Court has reinforced the requirement that a substantial nexus exist between Congress's exercise of an enumerated *41 power and the activity regulated by that exercise. In United States v. Morrison (2000) 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658, the Court held that the interstate commerce clause did not provide Congress authority to enact the civil remedy provisions of the Violence Against Women Act, inasmuch as the provision did not regulate activity which substantially affected interstate commerce. This year, in Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers (2001) 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576, the Court held that enactment of the Migratory Bird Act exceeded Congress's powers under the Commerce Clause.
In this case, no substantial nexus exists between the Indian commerce clause and the ICWA. Application of the ICWA to a child whose only connection with an Indian tribe is a one-quarter genetic contribution does not serve the purpose for which the ICWA was enacted, "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families" (25 U.S.C. ง 1902). For the reasons discussed above, as applied to this Minor, the ICWA impermissibly intrudes on a power reserved to the states, their care of dependent children.
Section 360.6 does not avoid a Tenth Amendment violation. The incorporation by reference of the ICWA in section 360.6 cannot convert the ICWA into an exercise of California's reserved power to legislate regarding family relations, because the legislation singles out the family relations of members of federally recognized Indian tribes, a subject over which the State of California lacks reserved power. (U.S. Const., art. I, ง 8, cl.3.)

II. WAIVER OF ICWA PLACEMENT PREFERENCES
We would also reverse on the separate and independent ground that the Tribe waived its assertion of ICWA placement preferences.

A. The Delay Between the Tribe's Notification of the Proceedings and Its Assertion of ICWA Placement Preferences
Within two weeks of the first hearing on this case, on December 17, 1998, the Department served a "Notice of Involuntary Child Custody Proceedings Involving Indian Child" on the Minnesota Chippewa Tribe at Case Lake, Minnesota. The notice included: the name of the Minor; his date and place of birth; the Mother's tribe; the Mother's maiden name, her birthplace, and date of birth; the county welfare agency with custody; that the Minor was in a non Native-American placement; the date, time and place of the next hearing, including the name of hearing officer; and the date the dependency petition had been filed. On the reverse side, it explained the Tribe's rights to participate in the proceedings. For the February 5, 1999 hearing, the Department sent a similarly addressed notice by certified mail to the Tribe. Notices were sent to the Tribe for hearings on February 5, 1999, May 17, 1999, and September 21, 1999, without any response from the Tribe.
Following the court's September 21, 1999, direction to the Department to contact the Tribe and get it involved, telephone contacts took place between the Department's CSW and the TSW for the Grand Portage Reservation. These contacts culminated in the identification of the Mother's first cousin as a possible prospective adoptive mother, then a December 12, 1999 communication from the Tribe advising that the cousin had decided that the Minor's adoption by Appellants was in his best interest, and that the Tribe did not intend to intervene, and that it intended *42 that the Minor remain with Appellants. The Tribe did not appear at any hearings prior to the court's direction to the Department that the Department get the Tribe involved, nor did the Tribe appear at the Minor's January 18, 2000 permanent plan hearing.
On March 1, 2000, the Tribe, as the Grand Portage Band of Chippewa, filed a petition to intervene and a motion to continue the case for 60 days. The court granted the petition in intervention, and the matter was continued.
On May 31, 2000, approximately 18 months after the Department's first notification to the Tribe of the Minor's dependency case, and eight months after reunification services to the Minor's Mother had been terminated, the Grand Portage Reservation Tribal Council notified the court that it supported renewed efforts at reunification, but that if the Mother failed to demonstrate changed circumstances at a hearing scheduled for June 1, 2000, the Tribe would support adoptive placement in an approved home of a Band member living on the Grand Portage Reservation. Whereas the petition to intervene was not opposed, the Tribe's assertion of placement preferences was opposed by both Appellants and the Minor.

B. Contentions of the Parties
Appellants contend that the Tribe waived its right to assert ICWA placement preferences by the substantial and harmful delay between the Department's first notification to it of the Minor's dependency case on December 17, 1998, and its May 31, 2000 proposal that the Minor be moved to a placement on the Grand Portage Reservation in Minnesota.
The Tribe, as the Grand Portage Band of the Chippewa, responds that it did not unduly delay its involvement in the Minor's case; it maintains that the ICWA required notification to the Band independent of notification to the Tribe, asserts that the Department failed to contact the Band until November 9, 1999, almost a year after the Department learned that the Mother was affiliated with it, and maintains that after it received notification it intervened quickly, within four months. With respect to the applicability of the doctrine of waiver to ICWA proceedings, the Band asserts that the only circumstance in which a placement may deviate from ICWA preferences is upon a finding of statutory good cause to depart from the preferences. Thus, the Tribe impliedly argues that assertion of ICWA placement preferences cannot, under any circumstances, be waived.

C. Discussion

1. The Department Gave Proper Notice
The representation that the Band, rather than the Tribe, was the entity to which the Department was required to give notice is unsupported by any competent, admissible evidence, and is incorrect. The Department was required to give notice of the Minor's proceedings to his Indian tribe. (25 U.S.C. ง 1912.) Title 25 United States Code section 1903(8), defines "Indian tribe" as any Indian tribe, band, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians, including any Alaskan Native village.
The Band cites to statements in its March 1, 2000, unverified petition to intervene and its accompanying declaration in support of its motion for a continuance as proof that the Band was a federally recognized Indian tribe such that separate notice to it was required. The *43 ICWA, however, does not abrogate the rules of evidence, and allegations in an unverified petition have no evidentiary value to prove facts stated therein. (Lundgren v. Superior Court (1980) 111 Cal.App.3d 477, 485, 168 Cal.Rptr. 717.) The Band also relies on hearsay in a declaration of counsel in support of the Band's motion for continuance: "I am informed and believe, based on information obtained from Bulldog, Olson & Small [the Band's general counsel], and on that basis allege that the Band is a federally recognized Indian tribe located in the State of Minnesota and is a sovereign governmental entity." While information and belief allegations are sufficient for a pleading, they do not prove the truth of the matters asserted therein. (Evid. Code, ง 1200.)
In fact, counsel was misinformed. Title 25 Code of Federal Regulations part 83.5(a) requires the Secretary of the Interior to publish in the Federal Register a list of all Indian tribes which are recognized and which receive services from the Bureau of Indian Affairs, and to update and publish that list no less frequently than every three years. The Department of the Interior's 1998 Notice of Indian Entities Recognized and Eligible to Receive Services from the United States Department of Indian Affairs (63 Fed.Reg. 71941-01, Dec. 30, 1998) lists the Minnesota Chippewa Tribe as an eligible tribe. [Id. at p. 71943.)[27] No separate listing exists for the Grand Portage Band of Chippewa Indians; the Grand Portage Band is identified as one of six component reservations of the Tribe. (Ibid.)[28] Thus, under Title 25 United States Code section 1903, it was the Tribe, and not the Grand Portage Band Reservation of the Tribe, that was required to receive notice of the Minor's dependency proceedings.
That the Department did not serve notice on the Tribe's chairman, as specified in California Rules of Court, rule 1439, does not render the notice defective. California Rules of Court, rule 1439, states that notice is to be sent to the Tribal chairman or whomever the tribe designates as its agent for service of the notice. The letter upon which the court relied in finding the ICWA to be applicable to the Minor indicated that notice to the Tribe was to be sent to Adrienne Atkins, Director of the Human Services Division of the Chippewa Tribe, in Cass Lake. This is where the Department's notice was sent.

*44 2. Both the ICWA and California Law Require Expeditious Action in Dependency Cases
The ICWA does not alter California Welfare and Institutions Code time limits pertaining to dependency cases; those time limits remain controlling. (Cal. Rules of Court, rule 1439(e).) For a child under the age of three, the time limits are particularly short; reunification services cannot exceed six months from the date the child entered foster care (ง 361.5, subd. (a)(2)) unless it can be shown that the permanent plan for the child is that he or she be returned and safely maintained in the parent's home, within a period not to exceed 18 months of the time he was originally taken into custody. (ง 361.6, subd. (a)(3).)
Once reunification services terminate, the focus of dependency proceedings shifts to providing stability and permanence for a child. (In re Marilyn H., supra, 5 Cal.4th at p. 309, 19 Cal.Rptr.2d 544, 851 P.2d 826.) For this Minor, that focus shifted September 21, 1999, without any communication having been received from the Tribe. It was not until after reunification services to the parents had been terminated and the court had ordered the Department's CSW to contact the Tribe and involve the Tribe in finding a placement for the Minor that the Tribe made any efforts at all on the Minor's behalf. This was too late in the process, and after the efforts proved unsuccessful, the Tribe informed the Department that it had exhausted its efforts.
California dependency law requires that all children for whom reunification services have been ordered also a concurrent, alternative plan for legal permanence in case reunification services prove unsuccessful. Instead of waiting until after reunification efforts have failed to begin permanency-planning efforts, reunification services and permanency planning must be considered and developed jointly. (งง 358.1, subd. (b); 16501.1, subd. (f)(9).)
Planning for the Minor's eventual permanent plan was, therefore, legally required well before the reunification services to the parents were terminated. On March 29, 1999, the Minor's placement had been changed from the home of his initial foster parents to Appellants' home not only because the initial foster parents had a family emergency requiring out-of-country travel, but also because they had not been interested in adopting the Minor in the event that reunification efforts with his parents failed. On April 16, 1999, shortly after the Minor was placed with Appellants, his adoption by them was identified as his permanency alternative to reunification with his parents. On July 29, 1999, the Minor was referred for adoption planning. The projected date for completion of the adoption was December 6, 1999.
Although a tribe may intervene at any stage of a child custody proceeding, both the ICWA and California Rules of Court, rule 1439 envision that an Indian child's tribe will take action within a matter of days, not months. Both provide that no foster care placement or termination of parental rights proceedings may be held within 10 days of the Indian child's tribe's notice of the proceeding, and both allow a maximum 20 day continuance for the tribe to prepare for it. (25 U.S.C. ง 1912; Cal. Rules of Court, rule 1439(h), emphasis added.)[29]
*45 The ICWA does not grant a tribe license to delay and to vacillate in making decisions that are vital to providing a dependent child with the permanent, stable home to which the dependency statutes entitle him. While the ICWA explicitly states that a tribe may intervene at any stage of the proceedings, no similar provision exists with respect to a Tribe's assertion of placement preferences.
Waiver is the intentional relinquishment of a known right (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 31, 44 Cal.Rptr.2d 370, 900 P.2d 619) and may occur by conduct warranting an inference of relinquishment of that right (Skulnick v. Roberts Express, Inc. (1992) 2 Cal.App.4th 884, 891, 3 Cal. Rptr.2d 597), including silence. The doctrine of waiver is applicable in dependency matters (In re Rodger H. (1991) 228 Cal. App.3d 1174, 279 Cal.Rptr. 406), to ICWA proceedings (Matter of Begay (App.1988) 107 N.M. 810, 765 P.2d 1178, In re Riva M. (1991) 235 Cal.App.3d 403, 286 Cal. Rptr. 592), and has been applied to such important rights as an Indian tribe's sovereign immunity. (C & L Enterprises v. Citizen Band Potawatomi Indian Tribe of Oklahoma (2001) 121 S.Ct. 1589.) Although not lightly inferred (Matter of Begay, supra, (N.M.App.1988) 765 P.2d at p. 1178), waiver may be found when the evidence shows it to be "clear." (C & L Enterprises v. Citizen Band Potawatomi Indian Tribe of Oklahoma, supra, at p. 1594.)
We find clear evidence of waiver of ICWA placement preferences here. The Tribe waived assertion of ICWA placement preferences both by its prolonged inaction, and by its December 1999 representation that it did not intend to intervene and that the Minor should remain placed with Appellants.
Because it is unnecessary to our decision to reach Appellant's final assignments of error, that the court abused its discretion in declining to find that good cause to depart from ICWA placement preferences, we decline to address that issue.

DISPOSITION
The placement order is reversed. The writ of supersedeas is dissolved, and the matter is remanded for further proceedings consistent with this opinion.
NOTT, J., and COOPER, J., concur.
NOTES
[1] All future references will be to the Welfare and Institutions Code, unless otherwise indicated.
[2] Throughout the juvenile court proceedings, Noah B. was referred to by the juvenile court and by the Department as the Minor's father. At the first hearing, however, the court had noted that Noah B.'s status was merely that of the Minor's declared biological father. Noah B. did not establish paternity, and the Mother's husband did not appear at any time in the proceedings. For consistency, we refer to Noah B. as the Minor's father, as did the court and the Department.
[3] The Chippewa Tribe did not intervene in the juvenile court proceedings in its own name. The Band, a unit of the Tribe, which erroneously represented itself as the Minor's Indian tribe within the meaning of the ICWA (25 U.S.C. ง 1903; 25 C.F.R., ง 83.5(a) (1994); 63 Fed.Reg. 71941-01 (Dec. 30, 1998)) did intervene. We deem that intervention to have been on behalf of the Tribe.
[4] The December 17, 1998 notice contained a slight misspelling of the name to whom the notices were to be sent. The notice was addressed to "Adrian Atkins" at the Minnesota Chippewa Tribe, Post Office Box 217, Cass Lake, Minnesota 56633, rather than to "Adrienne Adkins" at the same address.
[5] The letter was not offered into evidence, and, if different from the Tribe's June 3, 1999 letter to the Mother, such does not appear in the record.
[6] The ICWA provides that in any adoptive placement of an "Indian child" within the meaning of the Act, preference be given, absent good cause to the contrary, to placement with a Native American family. (25 U.S.C. ง 1915(a).) This preference is also stated in California Rules of Court, Rule 1439(k)(l).
[7] Rosemary Children's Services is the foster care agency which had placed the Minor in Appellants' home.
[8] We are unable to find the letter in our record.
[9] Family lineage charts attached to these documents indicate that Jacki K.'s maternal grandmother, Cecelia L., is the sister of Sophie L., the paternal grandmother of Kathleen B., the Minor's mother.
[10] The tone of the report is that transfer of the Minor to a Native-American family is a foregone conclusion, and the report explains that the TSW and Sa expressed sympathy to Appellants and explained to them the ICWA and Indian history and culture. Appellants apparently responded that if they must give up the Minor, they would cooperate to make his transition as easy as possible.
[11] Without informing the Department, the parents had moved back to Salem, Oregon. There they continued living together and had further personal difficulties, including substance abuse and at least one incident of domestic violence. By February 2000, the Mother had become sober and was involved in serious and regular rehabilitation efforts. After the Father assaulted the Mother in mid-March 2000, the parents apparently ceased living together, but there were circumstances indicating that their relationship had not ended.
[12] The statement of Congressional intent states, in full: "Recognizing the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people, the Congress findsโ[ถ] (1) that clause 3, section 8, article I of the United States Constitution [U.S. Constitution, art. I, ง 8, cl. 3] provides that, `The Congress shall have Power . . . To regulate Commerce . . . with Indian tribes' [Tribes'] and, through this and other constitutional authority, Congress has plenary power over Indian affairs; [ถ] (2) that Congress, though statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources; [ถ] (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or who are eligible for membership in an Indian tribe; [ถ] (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and [ถ] (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. ง 1901.)
[13] Child custody proceedings include: "(i) `foster care placement' which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated; [ถ] (ii) `termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship; [ถ] (iii) `pre-adoptive placement' which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and [ถ] (iv) adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." (25 U.S.C. ง 1903(1).)
[14] The "existing Indian family doctrine" was extensively briefed by the parties. The Tribe contends that application of the doctrine was not raised below, and therefore was waived by Appellants' failure to clearly articulate their reliance on it in the trial court. While it is true that ordinarily the failure to preserve a point below constitutes its waiver (Brown v. Boren (1999) 74 Cal.App.4th 1303, 1316, 88 Cal.Rptr.2d 758; Menefee v. County of Fresno (1985) 163 Cal.App.3d 1175, 1182, 210 Cal. Rptr. 99), orally raising an issue is sufficient to preserve it for appeal. (Conservatorship of Delay (1988) 199 Cal.App.3d 1031, 1035, fn. 3, 245 Cal.Rptr. 216.) The linchpin of Appellants' closing argument was that the ICWA was required to yield to the Minor's fundamental constitutional right to a stable and secure placement. While the Tribe correctly points out that Appellants' counsel appeared to concede that the ICWA was controlling, and that Appellants' counsel characterized the "existing Indian family" doctrine as having been repudiated in California, in context we find Appellants' counsel's comments sufficient to preserve for appeal the constitutionality of the ICWA as applied to the Minor. Moreover, we have discretion to consider a new theory on appeal when the theory involves applying the law to undisputed facts. (Yeap v. Leake (1997) 60 Cal.App.4th 591, 599, fn. 6, 70 Cal.Rptr.2d 680; Mattco Forge, Inc. v. Arthur Young & Co. (1997) 52 Cal.App.4th 820, 847, 60 Cal.Rptr.2d 780.) We exercise that discretion where, as here, an important issue of public policy is involved.
[15] Accepting the doctrine: Alabama (S.A. v. E.J.P. (Ala.Civ.App. 1990) 571 So.2d 1187); Indiana (Matter of Adoption of T.R.M. (Ind. 1988) 525 N.E.2d 298); Kansas (Matter of Adoption of Baby Boy L. (1982) 231 Kan. 199, 643 P.2d 168); Kentucky (Rye v. Weasel (Ky. 1996) 934 S.W.2d 257); Missouri (In Interest of S.A.M. (Mo.App.1986) 703 S.W.2d 603); New York (In re Adoption of Baby Girl S. (Sur.1999) 181 Misc.2d 117, 690 N.Y.S.2d 907); Oklahoma (Matter of Adoption of Baby Boy D. (Ok. 1985) 742 P.2d 1059); Tennessee (In re Morgan (Tenn.Ct.App.1997) WL 716880); Washington (Matter of Adoption of Crews (1992) 118 Wash.2d 561, 825 P.2d 305).

Rejecting the doctrine: Alaska (Matter of Adoption of T.N.F. (Alaska 1989) 781 P.2d 973); Idaho (Matter of Baby Boy Doe (1993) 123 Idaho 464, 849 P.2d 925); Illinois (In re Adoption of S.S. (1995) 167 Ill.2d 250, 212 Ill.Dec. 590, 657 N.E.2d 935); New Jersey (Matter of Adoption of a Child of Indian Heritage (N.J. 1988) 111 N.J. 155, 543 A.2d 925); South Dakota (Matter of Adoption of Baade (S.D.1990) 462 N.W.2d 485); Utah (State, in Interest of D.A.C. (Utah App.1997) 933 P.2d 993.)
[16] In 1995-1996, the 104th Congress considered amendments to the ICWA.
[17] In re Bridget R. (1996) 41 Cal.App.4th 1483, 49 Cal.Rptr.2d 507, cert. den. by Cindy R. et at. v. James R. et at., (1997) 519 U.S. 1060, 117 S.Ct. 693, 136 L.Ed.2d 616, cert. den. by Dry Creek Rancheria v. Bridget and Lucy R., 520 U.S. 1181, 117 S.Ct. 1460, 137 L.Ed.2d 564 (1997), the other, Matter of Baby Boy Doe (1993) 123 Idaho 464, 849 P.2d 925, cert. den. by Swenson et al. v. Oglala Sioux Tribe (1993) 510 U.S. 860, 114 S.Ct. 173, 126 L.Ed.2d 133, refusing to apply the doctrine.
[18] Section 360.6 states: "(a) The Legislature finds and declares the following:

[H] (1) There is no resource that is more vital to the continued existence and integrity of Indian tribes than their children, and the State of California has an interest in protecting Indian children who are members of, or are eligible for membership in, an Indian tribe. [ถ] (2) It is in the interest of an Indian child that the child's membership in the child's Indian tribe and connection to the tribal community be encouraged and protected. [ถ] (b) In all Indian custody proceedings, as defined in the federal Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.), the court shall consider all of the findings contained in subdivision (a), strive to promote the stability and security of Indian tribes and families, comply with the federal Indian Child Welfare Act, and seek to protect the best interest of the child. [H] (c) A determination by an Indian tribe that an unmarried person who is under the age of 18 years, is either (1) a member of an Indian tribe or (2) eligible for membership in an Indian tribe and a biological child of a member of an Indian tribe shall constitute a significant political affiliation with the tribe and shall require the application of the federal Indian Child Welfare Act to the proceedings."
[19] The Assembly and Senate analyses discuss the split of authority in California regarding the "existing Indian family doctrine" and summarize the cases refusing to apply the ICWA under the Doctrine. The analyses pay particular attention to In re Bridget R., and quote from Bridget R.'s due process and equal protection analysis at relative length. (Sen. Rules Com., Off. Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 65 (1999-2000 Reg. Sess.) as amended Apr. 22, 1999; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 65 (1999-2000 Reg. Sess.) as amended Apr. 22, 1999; (Assembly Floor on Judiciary on Bill No. 65 (1999-2000 Reg. Sess.) as amended Apr. 22, 1999; Assem. Com. on Judiciary, Assem. Bill No. 65 (1999-2000 Reg. Sess.) as amended Apr. 22, 1999.)
[20] Counsel for the Tribe informed us in oral argument that the Minor is one-half Hispanic.
[21] The Mother had been employed by the City of Los Angeles for an unspecified period of time, and had lived and been employed in Oregon for at least 13 years prior to the Minor's birth.
[22] We take judicial notice of the Constitution of the Minnesota Chippewa Tribe, on our own motion under Evidence Code section 452, subdivisions (b) and (f).
[23] The Fifth Amendment to the United States Constitution, applicable to actions of the federal government states, in pertinent part: ". . . nor shall any person . . . be deprived of life, liberty, or property, without due process of law. . . ." (U.S. Const., 5th Amend.) The Fourteenth Amendment, provides with respect to state action: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." (U.S. Const., 14th Amend., ง 1.)
[24] Appellants may raise the interests of the Minor, but as foster parents do not themselves possess an interest in a familial relationship with the Minor, which has been found to be fundamental for substantive due process analysis. (Smith v. Organization of Foster Families (1977) 431 U.S. 816, 838-847, 97 S.Ct. 2094, 53 L.Ed.2d 14.)
[25] At issue were financial incentives to prime contractors on public works projects to hire subcontractors certified as small businesses controlled by "socially and economically disadvantaged individuals," and which directed the prime contractor to presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native-Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Small Business Administration. (Adarand, supra, 515 U.S. at p. 207, 115 S.Ct. 2097.) The Small Business Administration (SBA) had two programs, one available to small businesses controlled by socially and economically disadvantaged individuals as the SBA defined those terms, and another in which the SBA presumed eligibility based on membership in a minority group, in addition to an individualized but more liberal showing of disadvantage than in the first group. In both programs, the presumption of disadvantage is rebuttable by evidence that the party is not socially or economically disadvantaged. Respondents argued that the classification was based on disadvantage, not race, and was therefore subject to rational basis analysis.
[26] In Bridget R. this genetic heritage classification was termed a racial classification. We think it more accurate to term it a classification based on ancestry, since federal law recognizes Native-Americans as a distinct class by virtue of their descent from what were originally independent sovereign nations. (Malabed v. North Slope Borough (1999) 42 F.Supp.2d 927, 930-931.) The analysis for discrimination based on race and ancestry is, in any event, identical.
[27] This listing is subject to mandatory judicial notice under Evidence Code section 451, subdivision (b).
[28] The Department of Interior 1998 Notice of Indian Entities Recognized and Eligible to Receive Services from the United States Department of Indian Affairs includes some bands as well as tribes, e.g., the Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin. The Grand Portage Band, however, is not similarly listed as a separate entity. (Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, (63 Fed.Reg. 71941-01 (Dec. 30, 1998).)

The Minnesota Chippewa Constitution confirms that the Grand Portage Reservation is a unit of the Tribe. The preamble to the Tribe's constitution states:
"We, the Minnesota Chippewa Tribe, consisting of the Chippewa Indians of the White Earth, Leech Lake, Fond du Lac, Bois Forte (Nett Lake), and Grand Portage Reservations and the Nonremoval Mille Lac Band of Chippewa Indians, in order to form a representative Chippewa tribal organization, maintain and establish justice for our Tribe, and to conserve and develop our tribal resources and common property, to promote the general welfare of ourselves and descendants, do establish and adopt this constitution for the Chippewa Indians, of Minnesota in accordance with such privilege granted the Indians by the United States under existing law." (Chippewa Const., PreAmble.)
[29] The 45-day continuance that the court granted the Tribe in March 2000, violated these provisions.